# EXHIBIT A

# MEMORANDUM OF AGREEMENT
C-50-07-058-2-00

This Memorandum of Agreement (MOA) constitutes an agreement between United States Immigration and Customs Enforcement (ICE), a component of the Department of Homeland Security (DHS), and Maricopa County, a political subdivision of the State of Arizona, pursuant to which ICE authorizes up to a maximum of 160 nominated, trained, and certified personnel of the Maricopa County Sheriff's Office (hereinafter interchangeably referred to as MCSO or the "Law Enforcement Agency" (LEA)), to perform certain immigration enforcement functions as specified herein. The MCSO represents Maricopa County in the implementation and administration of this MOA. It is the intent of the parties that these delegated authorities will enable the LEA to identify and process immigration violators in Maricopa County consistent with the terms of this MOA. The ICE and LEA points of contact for purposes of this MOA are identified in Appendix A.

## I.    PURPOSE

The purpose of this MOA is to set forth the terms and conditions pursuant to which selected LEA personnel (participating LEA personnel) will be nominated, trained, and thereafter perform certain functions of an immigration officer within the LEA. This MOA sets forth the scope of the immigration officer functions that DHS is authorizing the participating LEA personnel to perform. Nothing contained herein shall otherwise limit the jurisdiction and powers normally possessed by participating LEA personnel as members of the LEA. However, the exercise of the immigration enforcement authority granted under this MOA to participating LEA personnel shall occur only as provided in this MOA. This MOA also describes the complaint procedures available to members of the public regarding immigration enforcement actions taken by participating LEA personnel pursuant to this agreement.

## II.    AUTHORITY

Section 287(g) of the Immigration and Nationality Act (INA), also codified at 8 U.S.C. § 1357(g), as amended by the Homeland Security Act of 2002, Public Law 107-276, authorizes the Secretary of the Department of Homeland Security, acting through the Assistant Secretary of ICE, to enter into written agreements with a State or any political subdivision of a State so that qualified personnel can perform certain functions of an immigration officer. This MOA constitutes such a written agreement.

## III.    POLICY

This MOA sets forth the scope of the immigration officer functions that DHS is authorizing the participating MCSO personnel to perform. It sets forth with specificity the duration of the authority conveyed and the specific lines of authority, including the requirement that participating MCSO personnel are subject to ICE supervision while performing immigration-related duties pursuant to this MOA. For the purposes of this MOA, ICE officers will provide supervision for participating MCSO personnel only as to immigration enforcement functions. MCSO retains supervision of all other aspects of the employment and performance of duties of participating MCSO personnel.

IV.   ASSIGNMENTS

Before participating LEA personnel receive authorization to perform immigration officer functions granted under this MOA, they must successfully complete mandatory 5 week (4 week for LEA personnel functioning solely in a correctional facility or ICE detention facility) training in the enforcement of federal immigration laws and policies as provided by ICE instructors and thereafter pass examinations equivalent to those given to ICE officers.  Only participating LEA personnel who are selected, trained, authorized, and supervised, as set out herein, have authority pursuant to this MOA to conduct the immigration officer functions enumerated in this MOA.

Participating LEA personnel performing immigration-related duties pursuant to this MOA will be LEA officers assigned to the Violent Fugitive Apprehension Squad (VFAS), Criminal Investigations Section (CIS), Anti-Gang Unit, Drug Enforcement Unit and Community Action Teams (CAT).   Participating LEA personnel will be exercising their immigration-related authorities during the course of criminal investigations involving aliens encountered within Maricopa County.  Any combination of these officers or others may be assigned and/or co-located as task force officers to assist ICE agents with criminal investigations.

The mission of these various LEA assignments are summarized as follows:

Violent Fugitive Apprehension Squad (VFAS): The LEA personnel assigned to the VFAS unit are charged with the responsibility of identifying high-risk felons who are wanted for crimes or offenses that represent a significant threat to public safety.

Criminal Investigation Section (CIS): The LEA personnel assigned to CIS by statute are charged with the responsibility of identifying criminal enterprises and other forms of organized criminal activities.

Anti-Gang Unit: The LEA personnel assigned to the anti-gang unit engage in law enforcement actions that are targeted against gang activity.

Drug Enforcement Unit: The LEA personnel assigned to these various drug enforcement units are involved with illegal trafficking in narcotics investigations, quite often they encounter individuals who may be in the country illegally.

Community Action Teams (CAT): The LEA personnel assigned to the Community Action Teams are officers who have been assigned to these special units and charged with the responsibility of assisting local authorities in urban areas who have requested assistance due to pervasive criminal activity occurring in hot spots within their communities.

V.   DESIGNATION OF AUTHORIZED FUNCTIONS

For the purposes of this MOA, participating LEA personnel will be authorized to perform the following functions pursuant to the stated authorities, subject to the limitations contained in this MOA:

- The power and authority to interrogate any alien or person believed to be an alien as to his right to be or remain in the United States (INA § 287(a)(1) and 8 C.F.R. § 287.5(a)(1)) and to process for immigration violations those individuals who are convicted of State or Federal felony offenses;

- The power to arrest without warrant any alien entering or attempting to unlawfully enter the United States, or any alien in the United States, if the officer has reason to believe the alien to be arrested is in the United States in violation of law and is likely to escape before a warrant can be obtained.  INA § 287(a)(2) and 8 C.F.R. 287.5(c)(1).

- The power to arrest without warrant for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens.  INA § 287(a)(4) and 8 C.F.R. § 287(c)(2).

- The power to serve warrants of arrest for immigration violations under 8 C.F.R. § 287.5(e)(3).

- The power and authority to administer oaths and to take and consider evidence (INA § 287(b) and 8 C.F.R. § 287.5(a)(2)) to complete required criminal alien processing, to include fingerprinting, photographing, and interviewing, as well as the preparation of affidavits and the taking of sworn statements for ICE supervisory review;

- The power and authority to prepare charging documents (INA Section 239, 8 C.F.R. 239.1; INA Section 238, 8 C.F.R 238.1; INA Section 241(a)(5), 8 C.F.R 241.8; INA Section 235(b)(1), 8 C.F.R. 235.3) including the  preparation of the Notice to Appear (NTA) application or other charging document, as appropriate, for the signature of an ICE officer for aliens in categories established by ICE supervisors;

- The power and authority to issue immigration detainers (8 C.F.R. § 287.7) and I-213, Record of Deportable/Inadmissible Alien, for processing aliens in categories established by ICE supervisors; and

- The power and authority to detain and transport (8 C.F.R. § 287.5(c)(6)) arrested aliens to ICE-approved detention facilities.

## VI.   DETENTION ISSUES

The LEA is expected to pursue to completion prosecution of the state or local charges that caused the individual to be taken into custody. ICE will assume custody of individuals who have been convicted of a State or local offense only after such individuals have concluded service of any sentence of incarceration. ICE will also assume custody of aliens with prior criminal convictions and when immigration detention is required by statute. The ICE Detention and Removal Field Office Director or designee will assess on a case-by-case basis the appropriate removal vehicle to be employed and/or whether to assume custody of individuals that do not meet the above criteria based on special interests or other extenuating circumstances after processing by the LEA. The immigration laws provide ICE Detention and Removal Operations (DRO) with the discretion to manage limited DHS detention resources, and ICE Field Office Directors may exercise this discretion by declining to detain aliens whose detention is not mandated by federal statute.

If ICE determines that it is necessary, the LEA will enter into an Inter-Governmental Service Agreement (IGSA) with ICE pursuant to which, the LEA will provide, for a reimbursable fee, detention of incarcerated aliens in LEA facilities, upon the completion of their sentences. The LEA facility will be expected to meet the ICE detention standards for either a less than 72-hour or over 72-hour facility as determined by ICE, and consistent with the anticipated detention period.

The parties understand that the LEA will not continue to detain an alien after that alien is eligible for release from the LEA's custody in accordance with applicable law and LEA policy, except for a period of up to 48-hours, excluding Saturday, Sunday, and any holiday, pursuant to an ICE detainer issued in accordance with 8 C.F.R. § 287.7, absent an IGSA in place as described above.

Upon completion of processing and release from MCSO detention facilities of an individual who participating MSCO personnel have determined to be a removable alien, the alien will be transported by MCSO on the same day to the ICE detention office located at 2035 N. Central Ave., Phoenix, Arizona 85004 or another ICE designated office or facility, after notification to and coordination with the ICE supervisory officer, so that no further detention costs will be incurred by ICE.

## VII.   NOMINATION OF PERSONNEL.

The Sheriff of Maricopa County will nominate candidates for initial training and certification under this MOA. For each candidate, ICE may request any information necessary for a background check and to evaluate a candidate's suitability to participate in the enforcement of immigration authorities under this MOA. All candidates must be United States citizens. All candidates must have at least two years of LEA work experience. All candidates must be approved by ICE and must be able to qualify for appropriate federal security clearances.

4

Should a candidate not be approved, a substitute candidate may be submitted if time permits such substitution to occur without delaying the start of training. Any future expansion in the number of participating LEA personnel or scheduling of additional training classes may be based on an oral agreement of the parties, but will be subject to all the requirements of this MOA.

VIII.   TRAINING OF PERSONNEL

ICE will provide participating LEA personnel with the mandatory 4 and 5 week training tailored to the immigration functions to be performed. Training will take place at a mutually designated site in Maricopa County, utilizing ICE-designed curriculum and competency testing.

Training will include, among other things: (i) discussion of the terms and limitations of this MOA; (ii) the scope of immigration officer authority; (iii) relevant immigration law; (iv) the ICE Use of Force Policy; (v) Civil Rights laws; (vi) the U.S. Department of Justice "Guidance Regarding the Use Of Race By Federal Law Enforcement Agencies" dated June 2003; (vii) public outreach and complaint procedures; (viii) liability issues; (ix) cross-cultural issues; and (x) the obligations under federal law and the Vienna Convention on Consular Relations to make proper notification upon the arrest or detention of a foreign national.

Approximately one year after the participating LEA personnel are trained and certified, ICE may provide additional updated training on relevant administrative, legal, and operational issues related to the performance of immigration officer functions, unless either party terminates this MOA pursuant to Section XX below. Local training on relevant issues will be provided on an ongoing basis by ICE supervisors or a designated team leader.

IX.   CERTIFICATION AND AUTHORIZATION

The ICE Training Division will certify in writing to the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix the names of those LEA personnel who successfully complete training and pass all required testing. Upon receipt of Training Division certification, the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix will provide the participating LEA personnel with a signed authorization to perform specified functions of an immigration officer for an initial period of one year from the date of the authorization. ICE will also provide a copy of the authorization to the LEA. The ICE supervisory officer, or designated team leader, will evaluate the activities of all personnel certified under this MOA.

Authorization of participating LEA personnel to act pursuant to this MOA may be revoked at any time by ICE or the LEA. Such revocation will require immediate notification to the other party to this MOA. The Maricopa County Sheriff and the ICE Special Agent in Charge and ICE Field Office Director in Phoenix will be responsible for notification of the appropriate personnel in their respective agencies. The termination of this MOA, pursuant to Section XX below, shall constitute revocation of all immigration enforcement authorizations delegated hereunder.

X.    COSTS AND EXPENDITURES

Participating LEA personnel will carry out designated functions at the LEA's expense, including salaries and benefits, local transportation, and official issue material.

ICE will provide the instructors and training materials. The LEA is responsible for the salaries and benefits, including overtime, for all of its personnel being trained or performing duties under this MOA, and for those personnel performing the regular functions of the participating LEA personnel while they are receiving training. LEA will cover the costs of all LEA candidates' travel, housing, and per diem affiliated with the training required for participation in this agreement. ICE is responsible for the salaries and benefits of all of its personnel, including instructors and supervisors.

If ICE determines that it is necessary, the LEA will enter into an Inter-Governmental Service Agreement (IGSA) with ICE pursuant to which the LEA will provide, for a reimbursable fee, transportation for all incarcerated aliens in the LEA's facilities, upon the completion of their sentences, or upon completion of processing in those circumstances in which state or local prosecution is not available, to a facility or location designated by ICE. If ICE determines that it is necessary, the LEA will provide ICE, at not cost, with an office within each participating LEA facility for ICE supervisory employees to work.

ICE agrees to be responsible for the purchase, installation, and maintenance of technology (computer/IAFIS/Photo and similar hardware/software) necessary to support the investigative functions of participating LEA personnel at each LEA facility with an active 287(g) program. The use of this equipment is to be limited to the performance of responsibilities authorized by this MOA under section 287(g) of the INA by participating LEA personnel. ICE also agrees to provide the necessary technological support and software updates for use by participating LEA personnel to accomplish the delegated functions. Such hardware, software, and other technology purchased or provided by ICE, shall remain the property of ICE and shall be returned to ICE upon termination of this agreement, or when deemed necessary by the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix.

XI.    ICE SUPERVISION

Immigration enforcement activities conducted by the participating LEA personnel will be supervised and directed by ICE supervisory officers or the designated team leader in Phoenix. Participating LEA personnel are not authorized to perform immigration officer functions, except when working under the supervision of an ICE officer. Participating LEA personnel shall give timely notice to the ICE supervisory officer within 24 hours or any detainer issued under the authorities set forth in this MOA.

In the correction setting, participating MCSO personnel shall give notice to the ICE supervisory officer as soon as practicable after, and in all cases within 24 hours of, any detainer issued under the authorities set forth in this MOA. In the field setting, participating MCSO deputies will contact an ICE duty officer at the time of exercising the authority in this MOA for guidance. The actions of participating MCSO personnel will be reviewed by the ICE supervisory officers on an ongoing basis to ensure compliance with the requirements of the immigration laws and procedures and to assess the need for additional training or guidance for that specific individual.

For purposes of this MOA, ICE officers will provide supervision of participating LEA personnel only as to immigration enforcement functions. The LEA retains supervision of all other aspects of the employment of and performance of duties by participating LEA personnel.

In the absence of a written agreement to the contrary, the policies and procedures to be utilized by the participating LEA personnel in exercising these authorities shall be DHS and ICE policies and procedures, including the ICE Use of Force Policy. However, when engaged in immigration enforcement activities, no participating LEA personnel will be expected or required to violate or otherwise fail to maintain the LEA's rules, standards, or policies, or be required to fail to abide by restrictions or limitations as may otherwise be imposed by law.

If a conflict arises between an order or direction of an ICE supervisory officer and LEA rules, standards, or policies, the conflict shall be promptly reported to the ICE Special Agent in Charge and ICE Field Office Director in Phoenix, or designees, and the Sheriff of Maricopa County, or designee, when circumstances safely allow the concern to be raised. The Special Agent in Charge, the ICE Field Office Director in Phoenix, and the Sheriff of Maricopa County shall attempt to resolve the conflict.

Whenever possible, MCSO will deconflict all addresses, telephone numbers, and known or suspected identities of violators of the INA with ICE's Office of Investigations (OI) or ICE's Office of Detention and Removal (DRO) prior to taking any enforcement action. This deconfliction will, at a minimum, include wants/warrants, criminal history, and a person, address, and vehicle check through TECS II.

MCSO participating personnel authorized pursuant to this MOA may be assigned and/or co-located with ICE as task force officers to assist ICE agents with criminal investigations.

XII.   REPORTING REQUIREMENTS

The LEA will be responsible for tracking and maintaining accurate data and statistical information for their 287(g) program, including any specific tracking data requested by ICE. Upon ICE's request, such data and information shall be provided to ICE for comparison and verification with ICE's own data and statistical information, as well as for ICE's statistical reporting requirements and to assess the progress and success of the LEA's 287(g) program.

## XIII.   LIABILITY AND RESPONSIBILITY

If any participating LEA personnel are the subjects of a complaint of any sort that may result in that individual receiving employer discipline or becoming the subject of a criminal investigation or civil lawsuit, the LEA shall, to the extent allowed by state law, immediately notify ICE of the existence and nature of the complaint.  The resolution of the complaint shall also be promptly reported to ICE.  Complaints regarding the exercise of immigration enforcement authority by participating LEA personnel shall be handled as described below.

Except as otherwise noted in this MOA or allowed by federal law, the LEA will be responsible and bear the costs of participating LEA personnel with regard to their property or personnel expenses incurred by reason of death, injury, or incidents giving rise to liability.

Participating LEA personnel will only be treated as federal employees for purposes of the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680, and worker's compensation claims, 5 U.S.C. § 8101 et seq., when performing a function as authorized by this MOA. 8 U.S.C. § 1357(g)(7). It is the understanding of the parties to this MOA that participating LEA personnel will enjoy the same defenses and immunities available to ICE officers from personal liability arising from tort lawsuits based on actions conducted in compliance with this MOA. 8 U.S.C. § 1357(g)(8).

Participating LEA personnel named as defendants in litigation arising from activities carried out under this MOA may request representation by the U.S. Department of Justice.  Such requests must be made in writing directed to the Attorney General of the United States, and will be handled in coordination with the ICE Special Agent in Charge and/or the ICE Field Office Director in Phoenix.  Requests for representation must be presented to the ICE Office of the Chief Counsel at 2035 N. Central Avenue, Phoenix, AZ 85004.  Any request for representation and related correspondence must be clearly marked "Subject to Attorney-Client Privilege."  The Office of the Chief Counsel will forward the individual's request, together with a memorandum outlining the factual basis underlying the event(s) at issue in the lawsuit, to the ICE Office of the Principal Legal Advisor, which will forward the request, the factual memorandum, and an advisory statement opining whether such representation would be in the interest of the United States, to the Director of the Constitutional and Specialized Torts Staff, Civil Division, Department of Justice.  ICE will not be liable for defending or indemnifying acts of intentional misconduct on the part of participating LEA personnel.

The LEA agrees to cooperate with any federal investigation related to this MOA to the full extent of its available powers.  It is understood that information provided by any LEA personnel under threat of disciplinary action in an administrative investigation cannot be used against that individual in subsequent criminal proceedings, consistent with Garrity v. New Jersey, 385 U.S. 493 (1967).

As the activities of participating LEA personnel under this MOA are undertaken under federal authority, the participating LEA personnel will comply with federal standards and guidelines relating to the Supreme Court's decision in Giglio v. United States, 405 U.S. 150 (1972), and its progeny, which relates to the disclosure of potential impeachment information about possible witnesses or affiants in a criminal case or investigation.

XIV.   COMPLAINT PROCEDURES

The complaint reporting and resolution procedure for allegations of misconduct by participating LEA personnel, with regard to activities undertaken under the authority of this MOA, is included at Appendix B.

XV.   CIVIL RIGHTS STANDARDS

Participating LEA personnel who perform certain federal immigration enforcement functions are bound by all federal civil rights statutes and regulations, including the U.S. Department of Justice "Guidance Regarding The Use Of Race By Federal Law Enforcement Agencies" dated June 2003.

Participating LEA personnel will provide an opportunity for subjects with limited English language proficiency to request an interpreter.  Qualified foreign language interpreters will be provided by the LEA as needed.

XVI.   STEERING COMMITTEE

The ICE Special Agent in Charge, the ICE Field Office Director, and the Sheriff of Maricopa County shall establish a steering committee that will meet periodically to review and assess the immigration enforcement activities conducted by the participating LEA personnel and to ensure compliance with the terms of this MOA.   The steering committee will meet periodically in Maricopa County at locations to be agreed upon by the parties, or via teleconference.  Steering committee participants will be supplied with specific information on case reviews, individual participants' evaluations, complaints filed, media coverage, and, to the extent practicable, statistical information on increased immigration enforcement activity in Maricopa County.  An initial review meeting will be held no later than nine months after certification of the initial class of participating LEA personnel under Section IX, above.

XVII.   COMMUNITY OUTREACH

The LEA may, at its discretion, engage in community outreach with individuals and organizations expressing an interest in this MOA.  ICE may participate in such outreach upon the LEA's request.

XVIII.  RELATIONS WITH THE NEWS MEDIA

LEA may, at its discretion, communicate the substance of this agreement to organizations and groups expressing an interest in the law enforcement activities to be engaged in under this MOA. This MOA also describes the complaint procedures available to members of the public regarding actions taken by participating LEA personnel pursuant to this agreement.

The LEA hereby agrees to coordinate with ICE before releasing information to the media regarding actions taken under this MOA.  The points of contact for ICE and MCSO for this purpose are identified in Appendix C.

XIX.   MODIFICATION OF THIS MOA

Modifications to this MOA must be proposed in writing and approved by the signatories.

XX.   DURATION AND TERMINATION OF THIS MOA

This MOA will be in effect from the date of signing until it is terminated by either party.  Either party, upon written notice to the other party, may terminate the MOA at any time.  A termination notice shall be delivered personally or by certified or registered mail and termination shall take effect immediately upon receipt of such notice.

Either party, upon written or oral notice to the other party, may temporarily suspend activities under this MOA when resource constraints or competing priorities necessitate.  Notice of termination or suspension by ICE shall be given to the Sheriff of Maricopa County.  Notice of termination or suspension by MCSO shall be given to the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix.

Except for the provisions contained in Section XIII, this MOA does not, is not intended to, shall not be construed to, and may not be relied upon to create, any rights, substantive or procedural, enforceable at law by any person in any matter, civil or criminal.

By signing this MOA, each party represents it is fully authorized to enter into this MOA, and accepts the terms, responsibilities, obligations, and limitations of this MOA, and agrees to be bound thereto to the fullest extent allowed by law.

Date: 2/24/07                                   Date: _____

_Julie Myers_                                   (See attached page 10A)

Julie Myers                                     _____
Assistant Secretary                                Maricopa County
Immigration and Customs Enforcement                Board of Supervisors
Office of Homeland Security


Date: JAN 19, 2007

_____

Joe Arpaio
Sheriff
Maricopa County

**Maricopa County Board of Supervisors**

ACTING Chairman of the Board                    2-7-07
                                                Date

ATTEST:

Clerk of the Board                              2-7-07
                                                Date

**IN ACCORDANCE WITH A.R.S. §11-952 THIS CONTRACT HAS BEEN REVIEWED BY THE UNDERSIGNED WHO HAS DETERMINED THAT THIS CONTRACT IS IN APPROPRIATE FORM AND WITHIN THE POWERS AND AUTHORITY GRANTED TO EACH RESPECTIVE PUBLIC BODY.**

Andrew P. Thomas                                1-25-07
Maricopa County Attorney                        Date

This signature page is added and made part of
the Memorandum of Agreement (MOA) between
United States Immigration and Customs Enforcement (ICE)
and Maricopa County

(10A)

## APPENDIX A

### POINTS OF CONTACT

The ICE and MCSO points of contact for purposes of implementation of this MOA are:

For MCSO:

David A. Hendershott
Chief Deputy, Maricopa County Sheriff's Office
100 W. Washington Street, Suite 1900
Phoenix, AZ 85003
b6

For ICE DRO:

b6,b7c
Assistant Field Office Director
Detention and Removal Operations
2035 N. Central Avenue
Phoenix, AZ 85004     b2Low

For ICE OI:

b6,b7c
Deputy Special Agent in Charge
400 N. 5th Street, 11th Floor
Phoenix, AZ 85004
b2Low

11

# APPENDIX B

## COMPLAINT PROCEDURE

This MOA is an agreement between DHS/ICE and the Maricopa County Sheriff's Office, hereinafter referred to as the "Law Enforcement Agency" (LEA), in which selected LEA personnel are authorized to perform immigration enforcement duties in specific situations under Federal authority.  As such, the training, supervision, and performance of participating LEA personnel pursuant to the MOA, as well as the protections for individuals' civil and constitutional rights, are to be monitored.  Part of that monitoring will be accomplished through these complaint reporting and resolution procedures, which the parties to the MOA have agreed to follow.

The MOA sets forth the process for designation, training, and certification of certain LEA personnel to perform certain immigration enforcement functions specified herein.  Complaints filed against those personnel in the course of their non-immigration duties will remain the domain of the LEA and be handled in accordance with the LEA Manual of Policy and Procedures.  The LEA will also handle complaints filed against personnel who may exercise immigration authority, but who are not designated and certified under this MOA.  The number and type of the latter complaints will be monitored by the Steering Committee established under Section XVI of the MOA.

In order to simplify the process for the public, complaints against participating LEA personnel relating to their immigration enforcement can be reported in a number of ways.  The ICE Headquarters Office of Professional Responsibility (OPR) and the LEA's Internal Affairs Division will coordinate complaint receipt and investigation.

The ICE OPR will forward complaints to the Department of Homeland Security's Office of Inspector General (DHS OIG) as appropriate for review, and ensure notification as necessary to the U.S. Department of Justice Civil Rights Division (DOJ CRD).  The ICE OPR will coordinate complaints related to participating personnel with the LEA Internal Affairs Division as detailed below.  Should circumstances warrant investigation of a complaint by the DHS OIG or the DOJ CRD, this will not preclude the DHS OIG, DOJ CRD, or ICE OPR from conducting the investigation in coordination with the LEA's Internal Affairs Division, when appropriate.

The ICE OPR will adhere to established procedures relating to reporting and resolving allegations of employee misconduct, and the LEA's Internal Affairs Division will follow applicable LEA policies and procedures, personnel rules, Arizona statutes, and collective bargaining agreement requirements.

1. Complaint Reporting Procedures

Complaint reporting procedures shall be disseminated as appropriate by the LEA within facilities under its jurisdiction (in English and other languages as appropriate) in order to ensure that individuals are aware of the availability of such procedures.

Complaints will be accepted from any source (e.g.: ICE, LEA, participating LEA personnel, inmates, and the public).

Complaints can be reported to federal authorities as follows:

A.  Telephonically to the ICE OPR at the Joint Intake Center (JIC) in Washington, D.C. at the toll-free number 1-877-246-8253; or

B.  Telephonically to the Resident Agent in Charge of the ICE OPR office in Tucson, AZ at (520) 407-2200; or

C.  Via mail as follows:

> U.S. Department of Homeland Security
> U.S. Immigration and Customs Enforcement
> Office of Professional Responsibility
> 425 I Street, NW
> Room 3260
> Washington, D.C. 20536

Complaints can also be referred to and accepted by any of the following LEA entities:

A.  The LEA Internal Affairs Division; or

B.  The supervisor of any participating LEA personnel; or

C.  The LEA Internal Affairs Division as follows:
> Commander
> Internal Affairs Division
> Maricopa County Sheriff's Office
> 100 W. Washington Street, Suite 1900
> Phoenix, AZ  85003

2.  Review of Complaints

All complaints (written or oral) reported to the LEA directly, which involve activities connected to immigration enforcement activities authorized under this MOA, will be reported to the ICE OPR.  The ICE OPR will verify participating personnel status under the MOA with the assistance of the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix. Complaints received by any ICE entity will be reported directly to the ICE OPR as per existing ICE policies and procedures.

In all instances, the ICE OPR, as appropriate, will make an initial determination regarding DHS investigative jurisdiction and refer the complaint to the appropriate office for action as soon as possible, given the nature of the complaint.

Complaints reported directly to the ICE OPR will be shared with the LEA's Internal Affairs Division when the complaint involves LEA personnel.  Both offices will then coordinate appropriate investigative jurisdiction, which may include initiation of a joint investigation to resolve the issue(s).

3.  Complaint Resolution Procedures

Upon receipt of any complaint, the ICE OPR will undertake a complete review of each complaint in accordance with existing ICE allegation criteria and reporting requirements.  As stated above, the ICE OPR will adhere to existing ICE reporting requirements as they relate to the DHS OIG and/or the DOJ CRD.  Complaints will be resolved using the existing procedures, supplemented as follows:

A.  Referral of Complaints to LEA Internal Affairs Division.

The ICE OPR will refer complaints, as appropriate, involving LEA personnel to the LEA's Internal Affairs Division for resolution.  The Internal Affairs Division Commander will inform ICE OPR of the disposition and resolution of any complaints referred by ICE OPR.

B.  Interim Action Pending Complaint Resolution

Whenever any participating LEA personnel are under investigation and subject to interrogation by the LEA for any reason that could lead to disciplinary action, demotion, or dismissal, the policy requirements of the Maricopa County Sheriff's Office shall be honored.  If appropriate, an individual may be removed from participation in the activities covered under the MOA pending resolution of an inquiry.

C.  Time Parameters for Resolution of Complaints

It is expected that any complaint received will be resolved within 90 days.  However, this will depend upon the nature and complexity of the substance of the complaint itself.

D.  Notification of Resolution of a Complaint

ICE OPR will coordinate with the LEA's Internal Affairs Division to ensure notification as appropriate to the subject(s) of a complaint regarding the resolution of the complaint.

14

## APPENDIX C

## PUBLIC INFORMATION POINTS OF CONTACT

Pursuant to Section XVIII of this MOA, the signatories agree to coordinate any release of information to the media regarding actions taken under this MOA.  The points of contact for coordinating such activities are:

For MCSO:

Lt. Paul Chagoya
Public Information Office
Maricopa County Sheriff's Office
100 W. Washington Street, Suite 1900
Phoenix, AZ  85003
(602) 525-6239

For ICE:

Virginia Kice
Western Regional Communications Director/Spokesperson
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Western Region Public Affairs
24000 Avila Road
Laguna Niguel, CA  92677
(949) 360-3096

# EXHIBIT B



**U. S. Department of Justice**

Civil Rights Division

---

*Assistant Attorney General*                    *Washington, D.C. 20530*

December 15, 2011

Mr. Bill Montgomery
County Attorney
Maricopa County
301 West Jefferson Street
Phoenix, AZ  85003

   Re: <u>United States' Investigation of the Maricopa County Sheriff's Office</u>

Dear Mr. Montgomery:

   We write to report the findings of the Civil Rights Division's investigation into civil rights violations by the Maricopa County Sheriff's Office ("MCSO").  Our initial inquiry began in June 2008, and the investigation has focused on MCSO's compliance with the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141"), and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7 and its implementing regulations at 28 C.F.R. § 42.101 *et seq.* ("Title VI").  Section 14141 prohibits law enforcement agencies, such as MCSO, from engaging in activities that amount to a pattern or practice of violating the Constitution or laws of the United States.  Title VI and its implementing regulations provide that recipients of federal financial assistance, such as MCSO, may not discriminate on the basis of race, color, or national origin.  These laws give the United States the authority to file legal action and obtain the necessary relief to ensure compliance with the Constitution and laws of the United States.

   We notified MCSO of our formal investigation in March 2009.[1]  During our investigation, aided by four leading police practice experts, one jail expert, and an expert on statistical analysis, we reviewed tens of thousands of pages of documentary evidence; toured MCSO's jails; and interviewed over 400 individuals, including approximately 150 former and current MCSO jail inmates, and more than 75 former and current MCSO personnel, including the Sheriff, the Chief of Enforcement, the Chief of Patrol, the Administrative Investigative Commander, the Sergeant heading MCSO's Criminal Employment Squad, and the Lieutenant heading MCSO's Human Smuggling Unit.

---

[1] Our investigation was delayed when MCSO repeatedly refused to provide the United States with access to pertinent material and personnel.  After repeated attempts to resolve the dispute short of litigation, the United States filed a lawsuit in September 2010 to secure MCSO's compliance with its legal obligations to provide information pertinent to our investigation.  The United States and MCSO eventually resolved this lawsuit in June 2011 after MCSO agreed to provide us with the information and access we had been seeking.

-2-

Based upon our extensive investigation, we find reasonable cause to believe that MCSO engages in a pattern or practice of unconstitutional policing. Specifically, we find that MCSO, through the actions of its deputies, supervisory staff, and command staff, engages in racial profiling of Latinos; unlawfully stops, detains, and arrests Latinos; and unlawfully retaliates against individuals who complain about or criticize MCSO's policies or practices, all in violation of Section 14141. MCSO's discriminatory police conduct additionally violates Title VI and its implementing regulations.

We also find reasonable cause to believe that MCSO operates its jails in a manner that discriminates against its limited English proficient ("LEP") Latino inmates. Specifically, we find that MCSO, through the actions of its deputies, detention officers, supervisory staff, and command staff, routinely punishes Latino LEP inmates for failing to understand commands given in English and denies them critical services provided to the other inmates, all in violation of Title VI and its implementing regulations.

The absence of clear policies and procedures to ensure effective and constitutional policing, along with the deviations from widely accepted policing and correctional practices, and the failure to implement meaningful oversight and accountability structures, have contributed to a chronic culture of disregard for basic legal and constitutional obligations.

In addition to the formal findings noted above, we have identified three additional areas of serious concern that, while not warranting a formal pattern or practice finding at this time, require further investigation. First, our investigation revealed a number of troubling incidents involving MCSO deputies using excessive force against Latinos. Second, we observed that MCSO has implemented its immigration enforcement program in a way that has created a "wall of distrust" between MCSO officers and Maricopa County's Latino residents—a wall of distrust that has significantly compromised MCSO's ability to provide police protection to Maricopa County's Latino residents.[2] Third, we have expanded our investigation to encompass a review of serious allegations that MCSO failed to investigate a large number of sex crimes.

Given the systemic nature of MCSO's constitutional violations, effective resolution of this matter will require the development of a comprehensive written agreement along with federal judicial oversight. We prefer to resolve this matter without resort to further litigation, although we will not hesitate to file suit, if necessary. We would like to immediately begin a constructive dialogue about comprehensive and sustainable ways to remedy the identified violations of the Constitution and federal law. Please let us know by close of business on January 4, 2012, if MCSO is interested in having this dialogue. If MCSO is not interested or if we deem that MCSO is not engaged in good-faith efforts to achieve compliance by voluntary means, we are prepared to file a civil action to compel compliance.

In the remainder of this letter, we highlight our factual and legal findings, broadly describe our investigation of MCSO's practices, provide an outline of our factual findings in sufficient detail to give you fair notice of the violations committed, briefly discuss how those

---

[2] During one of our interviews, an MCSO deputy used the term "wall of distrust" to describe the adverse effect of MCSO's immigration law enforcement policies on the relationship between MCSO and the Latino community.

factual findings relate to MCSO's violations of federal law, and outline the remedial measures
MCSO must undertake to comply with the law.

## SUMMARY OF FINDINGS

### Discriminatory Policing

Our factual findings relating to MCSO's discriminatory police practices include, but are not
limited to, the following:

- Based upon a recent statistical study, commissioned by the Department of Justice
  ("Department"), of MCSO traffic stop activities on Maricopa County roadways,
  Latino drivers are four to nine times more likely to be stopped than similarly situated
  non-Latino drivers.

- Our review (which was conducted with the assistance of our expert law enforcement
  consultants) of all of the traffic-related incident reports generated by MCSO's Human
  Smuggling Unit ("HSU") over a three-year period showed that roughly one-fifth of
  the reports, almost all of which involved Latino drivers, contained information
  indicating that the stops were conducted in violation of the Fourth Amendment's
  prohibition against unreasonable seizures.

- Individual accounts regarding MCSO deputies stopping Latinos on the basis of their
  appearance corroborate the use of discriminatory policing practices.

- Our investigation uncovered a number of instances in which immigration-related
  crime suppression activities were initiated in the community after MCSO received
  complaints that described no criminal activity, but rather referred, for instance, to
  individuals with "dark skin" congregating in one area, or individuals speaking
  Spanish at a local business. The use of these types of bias-infected indicators as a
  basis for conducting enforcement activity contributes to the high number of stops and
  detentions lacking in legal justification.

### Discriminatory Jail Practices

With respect to MCSO's jail practices, MCSO sent us a 53-page letter acknowledging its
obligations to treat inmates who are limited English proficient ("LEP inmates") in accordance
with its obligations under federal law and provided examples of how it allegedly complies with
those obligations. However, our investigation uncovered the following:

- MCSO detention officers discriminatorily punish Latino LEP inmates who fail to
  understand commands given in English by, for example, locking down their pods
  (which increases the risk of inmate-on-inmate violence), or imposing disciplinary
  segregation (solitary confinement).

- MCSO detention officers refuse to accept forms completed by Latino LEP inmates in
  Spanish. Such forms include tank orders, which enable inmates to request basic daily
  services, and grievance forms, which enable inmates to identify and address alleged

mistreatment. Even in instances when Spanish language requests are accepted, Latino LEP inmates face delays in services for not submitting requests and grievance forms in English.

- MCSO pressures Latino LEP inmates to sign voluntary return forms that implicate constitutional and statutory rights without language assistance.

- Latino LEP inmates are limited in their ability to access important services, such as services enabling early release, and are denied access to basic information about programs and services, since most announcements are made in English only.

**Findings Pertaining to Both Police and Jail Practices**

- MCSO retaliates against individuals who criticize its police practices, including practices relating to its discriminatory treatment of Latinos, by subjecting its critics to retaliatory detentions and arrests without cause, unfounded civil lawsuits, and other baseless complaints.

- MCSO fosters and perpetuates discriminatory police and jail practices by failing to operate in accordance with basic policing and correctional practices and by failing to develop and implement policing and correctional safeguards against discrimination in such areas as training, supervision, and accountability systems.

- The pervasive nature of MCSO's discriminatory treatment of Latinos reflects a general culture of bias within MCSO.

**Legal Findings Under Section 14141 & Title VI and its Implementing Regulations**

The evidence uncovered during our investigation supports the following legal conclusions/determinations:

- MCSO discriminates against Latinos by engaging in police practices that violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Section 14141, Title VI, and the Department's Title VI implementing regulations.

- MCSO discriminates against its Latino LEP inmates on the basis of their national origin in violation of Title VI and the Department's Title VI implementing regulations.

- MCSO engages in a pattern or practice of unlawful seizures, including unjustified stops, detentions, and arrests, of Latinos in violation of the Fourth Amendment to the United States Constitution and Section 14141.

- MCSO engages in a pattern or practice of retaliatory actions against individuals who complain about MCSO's conduct or criticize MCSO's operations and policies,

-5-

especially its immigration-related policies, in violation of the First Amendment to the United States Constitution and Section 14141.

## INVESTIGATIVE BACKGROUND

In June 2008, after considering publicly available information, the Civil Rights Division opened a preliminary inquiry into allegations that MCSO was engaged in a pattern or practice of unlawful conduct. The inquiry was unrelated to a previous investigation of Maricopa County jails concerning the excessive use of force against inmates and MCSO's deliberate indifference towards their medical needs.[3] On March 10, 2009, we notified MCSO and Sheriff Joseph Arpaio that we were investigating allegations of discriminatory police practices, unlawful search and seizures, and discriminatory treatment of Latino LEP inmates. Shortly thereafter, MCSO refused to provide the Department with access to pertinent documents, facilities, and personnel. For over eighteen months, MCSO consistently refused to cooperate with our investigation. As a result, we had to assert our right to access pertinent sources of information. On September 2, 2010, the United States filed suit against MCSO under Title VI, its implementing regulations, and the contractual assurances MCSO had entered into with the United States, all of which require MCSO, as a recipient of federal financial assistance, to cooperate with investigations relating to Title VI compliance. During this period, we continued our investigation without the cooperation of MCSO, gathering and reviewing documents from various sources external to MCSO and interviewing numerous Maricopa County residents who provided accounts of being victims of MCSO's discriminatory police practices.

After we filed our Title VI lawsuit, MCSO reversed course, and provided us with the cooperation we had been seeking. MCSO permitted the Department's attorneys and experts to interview Sheriff Arpaio; conduct dozens of interviews, including interviews of command staff, deputies, detention officers, first-line supervisors, and jail inmates. MCSO also allowed tours of its six facilities and responded to our original document requests. Moreover, under the terms of a court-enforceable agreement entered into on June 2, 2011, MCSO committed itself to providing the Department with any remaining access the Department needed in order to complete its investigation.

Our findings are based on the information we received prior to and as a result of our Title VI suit and subsequent agreement, including reviewing official documents and interviewing numerous MCSO officials and Maricopa County residents. In addition, our findings incorporate the analysis of experts, including four current and former police executives with extensive knowledge of policing standards and practices, a correctional expert with substantial experience as a correctional administrator and a jail and prison auditor, and a statistician with extensive experience reviewing police practices.

---

[3] In August 1995, the Civil Rights Division initiated an investigation to determine whether conditions at MCSO jails violated inmates' constitutional rights, pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 *et seq*. We concluded that unconstitutional conditions existed at the jails with respect to (1) the use of excessive force against inmates and (2) deliberate indifference to inmates' serious medical needs. An agreement between the United States and MCSO was reached in October 1997.

## FACTUAL FINDINGS

We find that MCSO deputies, detention officers, supervisory staff, and command staff, including Sheriff Arpaio, have engaged in a widespread pattern or practice of law enforcement and jail activities that discriminate against Latinos. This discrimination flows directly from a culture of bias and institutional deficiencies that result in the discriminatory treatment of Latinos.

### A.   Discriminatory Police Practices

Both the Constitution and Title VI prohibit intentional discrimination on the basis of race, color, or national origin. In addition, Title VI's implementing regulations ban recipients of federal funds from engaging in activities that have a discriminatory effect on the basis of race, color, or national origin.

It is MCSO's prerogative to establish enforcement priorities. At the same time, in the course of implementing its enforcement priorities, MCSO must comply with the Constitution and laws of the United States. Since roughly 2007, in the course of establishing its immigration enforcement program, MCSO has implemented practices that treat Latinos as if they are all undocumented, regardless of whether a legitimate factual basis exists to suspect that a person is undocumented. By emphasizing its immigration enforcement efforts without following basic policing protocols and without implementing any meaningful safeguards against discriminatory police practices, MCSO has engaged in a series of practices that have adversely and disproportionately impacted Latinos. While MCSO has undergone some recent changes in its command staff, these problems have continued, and we have observed no substantive changes in MCSO's policies, protocols, or policing practices.

First, MCSO deputies target Latino drivers. A statistical analysis of MCSO's traffic stops made since the initiation of MCSO's immigration enforcement program—which is dominated by the use of pretextual stops—shows that MCSO's enforcement practices have a discriminatory impact on Latino drivers. We had a leading expert on measuring racial profiling through statistical analysis examine MCSO traffic stops. The expert found that Latino drivers were between four to nine times more likely to be stopped than similarly situated non-Latino drivers. Overall, the expert concluded that this case involves the most egregious racial profiling in the United States that he has ever personally seen in the course of his work, observed in litigation, or reviewed in professional literature.

Second, MCSO's HSU, which purportedly focuses on interdicting both human smugglers and their victims, engages in unlawful conduct in its attempts to enforce immigration-related laws. HSU deputies stop, detain, and/or arrest Latino drivers without adequate cause. When we reviewed all of the traffic-related incident reports generated by HSU from March 2006 to March 2009, we found that roughly 20% of the reports contained information indicating that the stops, almost all of which involved Latino drivers, were conducted without reasonable suspicion or probable cause. Further, HSU's enforcement actions rarely result in human smuggling arrests. During our interviews, an HSU deputy stressed that his unit conducts a "ton of stops" and he estimated the "hit rate" (success rate as measured by frequency of smuggling arrests) to be at 10% to 15%. Accordingly, 85% to 90% of the vehicles HSU stops purportedly based on suspicion of immigration violations have, at most, committed a traffic violation. Pretextual stops

motivated by racial bias, or that are the result of a policy targeting a protected group, are impermissible. The typical characteristic of HSU's enforcement efforts is, therefore, the targeting and harassment of Latino drivers rather than the effective enforcement of immigration law, an element of MCSO's overall pattern of discrimination against Latinos in Maricopa County.

Third, witness accounts are consistent with the data: MCSO's immigration enforcement practices are unconstitutional and are harming innocent Latinos. Below are just two of the many examples we discovered during our investigation:

- A.A., a legal resident of the United States who is Latino, was pulled over by an MCSO deputy in June 2008, during a crime suppression operation in Mesa, due to an alleged failure to use his turn-signal. The deputy requested that A.A. provide a driver license and other documents. A.A. did not produce a driver license, but did provide the deputy with an Arizona identification card, a valid work visa, a Social Security card, and a Mexican passport. Without any evidence that A.A. had engaged in criminal activity, the deputy instructed him to sit on the curb of the street for 15 minutes. The deputy then placed A.A. under arrest for failing to provide any type of proper identification, even though A.A. had provided him with multiple documents in satisfaction of the Arizona law regarding unlicensed drivers. A.A. was incarcerated for 13 days before his citation was dismissed.

- B.B., a legal resident of the United States, and his 12 year-old son, a U.S. citizen, are both Latino. In May 2009, a group of MCSO deputies conducted a raid of a house neighboring B.B.'s home that the deputies suspected of being a "drop house" for human smuggling. At some point during the raid, two of the MCSO deputies involved entered A.A's home after obtaining consent to enter. Without obtaining consent to search, the deputies searched the home without a warrant. Although they found no evidence of criminal activity in the house, the MCSO deputies proceeded to handcuff both B.B. and his son with plastic zip-ties and remove them from their home. The deputies directed both to sit on the sidewalk next to approximately ten other individuals who had been removed from the neighboring house. MCSO released B.B. and his son without any citation after detaining them with restraints for more than an hour.

Fourth, we find that MCSO's regular and highly publicized "crime suppression" operations adversely impact Latinos. During these operations, which often use vast numbers of personnel for many hours and which one MCSO lieutenant referred to as "round-ups of illegal aliens," deputies are encouraged to make high-volume pretextual traffic stops in targeted locations. We have identified and interviewed Latinos who, though legally present in the United States, were arrested or detained without cause as a consequence of these operations.

Fifth, MCSO's Criminal Employment Squad ("CES") deputies, tasked with interdicting undocumented persons by enforcing state forgery and identity theft statutes, routinely raid businesses in a manner that harms innocent Latino workers. Specifically, CES's deputies typically detain and investigate the immigration status of all employees at a raided worksite,

whether or not the employees are listed in the warrant authorizing the raid. The CES targets worksites where most, if not all, of the employees are Latino.

Sixth, MCSO makes use of unverified tips and/or constituent complaints about the presence of Latinos that are infected with bias against Latino persons, but contain no credible information concerning criminal activity or immigration violations, in selecting sites for immigration enforcement operations. This practice too has had a disparate and adverse impact on Maricopa County's Latino residents. For example:

- Sheriff Arpaio received a letter in August 2008 expressing dismay that the employees of a Sun City McDonald's did not speak English and suggesting that Sheriff Arpaio should "check this out" and "check out Sun City." Because the letter only alleged that a business had Spanish-speaking employees, the only basis it provided for a police response was the biased assumption that speaking Spanish was indicative of undocumented status. Though the letter did not describe unlawful conduct of any kind, Sheriff Arpaio wrote a note on the letter directing a response thanking the writer "for the info" and stating that he would "look into it." Sheriff Arpaio also forwarded the letter to MCSO Enforcement Chief Brian Sands with the handwritten instruction "for our operation." Two weeks later, MCSO conducted an immigration operation in Sun City.

- Sheriff Arpaio also received a letter in May 2008 complaining that police had not stopped day laborers in Mesa "in order to determine whether these day laborers are here under legitimate circumstances" although the writer of the letter "believe[d] that they were in the country illegally." Sheriff Arpaio marked the quoted sections of the letter, believing them to be "intelligence," and forwarded the letter to Chief Sands. Sheriff Arpaio later testified that being a day laborer is not a crime. Sheriff Arpaio then received a similar letter later that month stating that Mesa needed "a sweep . . . terribly" and accusing specifically Latino members of MCSO and the Mesa Police Department of negligence in pursuing "illegals." Sheriff Arpaio directed that a thank you letter be written, noted that "I will be going into Mesa," and forwarded the letter to Chief Sands. Chief Sands later testified that he assumed that the letter's author correlated undocumented persons with "dark-complected people." Despite the bias evident in both letters, MCSO conducted crime suppression operations in Mesa on June 26-27, 2008, and on July 14, 2008.

Seventh, we note that MCSO's prioritization of immigration enforcement may have compromised its ability to secure the safety and security of Maricopa County residents. Since MCSO shifted its focus toward combating illegal immigration, violent crime rates in the county have increased significantly as compared to similarly situated jurisdictions.[4] From 2004 to the

---

[4] Clint Bolick, *Mission Unaccomplished: The Misplaced Priorities of the Maricopa County Sheriff's Office*, 229 Goldwater Institute Policy Report, Dec. 2, 2008, at 1 (citing FBI Uniform Crime Reporting Statistics); *See also* Ryan Gabrielson & Paul Giblin, *Reasonable Doubt*, East Valley Tribune (July 9-13, 2008), *http://www.eastvalleytribune.com/special_reports/reasonable_doubt/*; Jacques Billeaud, *Critics: 'Tough' Sheriff Botched Sex-Crime Cases*, Associated Press (Dec. 4, 2011), *http://abcnews.go.com/US/wireStory/critics-tough-sheriff-botched-sex-crime-cases* (reporting that MCSO failed to adequately investigate approximately 70 in El

end of 2007, reported violent crimes grew by over 69 percent, including a 166 percent increase in homicides over the three-year period.[5] Since 2008, violent crime rates have remained at roughly the same level in Maricopa County, while dropping by over 10 percent in similarly situated jurisdictions.[6]

## B.    Discriminatory Language Access Jail Practices

The national origin discrimination prohibited by Title VI and its implementing regulations includes practices and procedures that deny meaningful access to linguistic minorities subject to the jurisdiction of a federally funded recipient. MCSO, through its correctional officers, supervisory staff, and command staff, implements language access practices that have a discriminatory impact on Latinos (who make up the vast majority of MCSO's LEP inmates). In its June 2010 Position Statement, MCSO acknowledged the importance of communicating with Spanish-speaking inmates in Spanish: "Because of the large number of Spanish speaking inmates, the use of Spanish is not only important to everyday communication, it is essential to the overall operation of the jails and the safety of the inmates and officers." Nonetheless, MCSO's language access practices fall far short of what is required and disproportionately harm Latinos in a number of ways.

First, our investigation revealed that officers have refused to accept forms completed by LEP inmates in Spanish, including tank orders, which contain requests for the most basic daily jail services, and grievance forms, which enable inmates to identify and address alleged mistreatment. In one incident, an inmate reported that a detention officer told him: "This is America. You have to fill [your tank order] out in English." Detention officers confirmed that comments like these were made by fellow officers. In addition, four detention officers admitted that they do not accept inmate requests written in Spanish. One detention officer recounted that she returns tank orders submitted to her in Spanish and instructs the inmate to obtain an English translation.

Second, Latino LEP inmates are told to sign important forms written in English without the aid of appropriate language assistance. For example, witnesses report that MCSO officials pressure Latino LEP inmates to sign English language voluntary return forms by yelling at them, routinely failing to advise them of their rights, and confining them in uncomfortably cold cells for extended periods of time. Although signing a voluntary return form may allow an individual to avoid a formal order of removal—a type of expulsion from the United States that carries more severe immigration consequences for the expelled individual—a person who signs a voluntary return form has agreed, in effect, to leave the United States without attempting to (or working with an attorney to attempt to) assert any rights he or she may have to stay.

---

Mirage and more than 400 countywide, respectively, sex-crimes—including dozens of child molestations—during a three-year period ending in 2007).

[5] Bolick, *supra* note 4, at 4.

[6] FBI Uniform Crime Reporting Statistics for MCSO, Mesa Police Department, and Phoenix Police Department, http://www.ucrdatatool.gov/.

-10-

Third, detention officers punish, directly and indirectly, Latino LEP inmates for their inability to fully understand or fluently speak English. For instance, the inability of one Latino LEP inmate to understand a command given in English can result in the confinement ("lockdown") of an entire house or pod. Lockdowns are sometimes in effect for as long as 72 hours. When a lockdown is ordered, inmates must return to their cells and are denied access to the visitor area, canteen recreation area, television, non-legal telephone calls, and inmate programs. Punishing other inmates for a Latino LEP inmate's inability to understand English commands endangers the LEP inmate. A Latino LEP inmate's inability to understand a detention officer's English language instructions also can result in the detention officer sending the inmate into disciplinary segregation, commonly referred to as being sent to the "hole." Inmates sent to the hole are confined 23 hours each day, and are denied non-legal telephone use, regular visits, television, program participation (including church services), and access to the canteen (except hygiene items). Such disciplinary actions are especially troubling when considering that many Latino LEP inmates reported that they never received a copy of the Inmate Rules and Regulations, or did not receive a copy in a language they could comprehend, denying them a basic understanding of jail policies.

Fourth, MCSO discriminates against Latino LEP inmates by failing to provide them with equal access to a range of services, opportunities, and benefits available to other inmates. For example:

- Detention officers have denied requests for new clothes or sheets when items are soiled because the inmates made the request in Spanish. One Latino LEP inmate attempted to use a fellow inmate as an interpreter to explain that her sheets were soiled. The detention officer refused the request, insisting that the inmate had to make the request herself in English.

- Latino LEP inmates are frequently denied access to basic information about programs and services as most announcements are made in English only, including announcements about recreation and the collection of grievances.

- Latino LEP inmates have been denied the opportunity to serve in trustee-type positions whereby certain inmates assist with daily tasks in the jails, which adversely impacts the LEP inmates because inmates selected to perform these chores typically receive preferential treatment, such as additional food, a change of clothes, and greater freedom of movement.

- Latino LEP inmates are denied access to important activities, including access to a program that enables inmates to obtain early release by performing community service.

## C.   Direct Evidence of Discriminatory Bias

We find a pervasive culture of discriminatory bias against Latinos at MCSO that reaches the highest levels of the agency. Supervisors of MCSO's police operations, including at least one directly involved in supervising the HSU, have sent emails that demean and express derision for Latinos to fellow command staff members, deputies, and posse volunteers, often using county

email accounts.  One email mocks individuals of Mexican national origin by including as an attachment a faux driver license issued to an individual caricatured to be Mexican and designated as originating from "Mexifornia," with a driver class of "illegal alien."  Yet another email contains two pictures purporting to illustrate the difference between "Indian Yoga" and "Mexican Yoga," contrasting a picture of a man in a yoga pose and an apparently inebriated man prone on the ground.

In MCSO's jails, detention officers direct racial slurs at Latino inmates.  Detention officers also insult or ignore Latino inmates when they attempt to communicate in Spanish.  A detention officer confirmed that officers on her shift frequently tell Latino LEP inmates to speak in English.  Other detention officers observed similar hostility:  detention officers learn curse words in Spanish, enabling them to swear at Latino inmates, and report hearing staff using slurs when referring to Latino persons.  Our investigation also found that MCSO detention officers call Latinos "wetbacks," "Mexican bitches," "fucking Mexicans," and "stupid Mexicans" when either talking among themselves or addressing Latino inmates.

Sheriff Arpaio's own actions have helped nurture MCSO's culture of bias.  For example, Sheriff Arpaio has frequently distributed racially charged constituent letters, annotating the letters with handwritten notes that appear to endorse the content of the letter, circulating the letters to others on the command staff, and/or saving the letters in his personal file.  Many of these letters contain no meaningful descriptions of criminal activity—just crude, ethnically derogatory language about Latinos.  For example, Sheriff Arpaio received a letter asking him to do a "round-up" at 29th Street and Greenway in Phoenix.  The letter justified the requested police action by asserting that "[i]f you have dark skin, then you have dark skin.  Unfortunately, that is the look of the Mexican illegals who are here illegally."  Instead of ignoring the request to focus on "dark-skin[ned]" people, Sheriff Arpaio, believing that the letter was relevant "intelligence," passed it on to a member of his command staff with a note instructing him to "[h]ave someone handle this."  Labeling as "intelligence" a letter explicitly equating skin color with law-breaking and instructing a subordinate to address it are striking examples of how Sheriff Arpaio has promoted a culture of bias in his organization and clearly communicated to his officers that biased policing would not only be tolerated, but encouraged.

## D.    Departures from Policing and Correctional Standards and Procedures

MCSO has adopted and maintained deficient policies and procedures that depart from policing and correctional standards and lead to violations of constitutional and federal rights.  We find that MCSO's oversight and accountability, training in non-biased policing, and policies for deputy conduct substantially depart from generally accepted policing standards.  MCSO's practices are often most egregiously deficient where they directly relate to MCSO's immigration enforcement program.

Contrary to standard policing practices throughout the country, MCSO supervisors have made a variety of statements undervaluing the usefulness of statistics and data collection for effective law enforcement.  MCSO does not require deputies on patrol to keep a log of their activities, but instead requires them only to enter a highly limited amount of data into the Computer Aided Dispatch system and to produce records only for their citations and arrests.  Consequently, whenever one of its deputies stops a motorist without issuing a citation, MCSO

-12-

cannot review the basis for the stop, nor can it directly track the ethnicity of the stopped driver. MCSO's decision to allow its deputies to go about their traffic work without having to report many of their stops ensures that MCSO will be unable to properly monitor its deputies' traffic work or identify officers engaged in racial profiling. In the jails, MCSO has no reliable practice of documenting which inmates are LEP, leaving detention officers to guess at the language needs of the inmates.

MCSO has failed to put in place meaningful oversight and accountability structures. Such structures include systems for documenting deputy or detention officer activity and for handling complaints. MCSO departs significantly from generally accepted policing standards in its implementation of these systems. With respect to complaints, MCSO has a policy of routing all misconduct complaints to the immediate supervisor of the deputy involved. The first-line supervisor then has discretion to close the investigation without any further involvement from the command structure or Internal Affairs and without further documenting the complaint in any way. Consequently, MCSO does not track complaints directed at deputies or units within the organization. Further, because deputy misconduct often reflects poorly on the actions or inactions of the first-line supervisor, MCSO's system of relying on first-line supervisors places the critical determination of whether to go forward with an investigation in the hands of someone who has an inherent conflict of interest in having a matter thoroughly investigated.

The complaint process is also substandard in the jails. When inmates file grievances against detention officers, it is common practice for the detention officer named in the complaint to resolve the grievance by pressuring the inmate to sign a release, resulting in no further review of the complained-of activity.

Contrary to standard law enforcement practices, MCSO neither offered nor required training on how to avoid engaging in biased policing until as recently as 2010 (well over a year after we notified MCSO of the commencement of our investigation into biased police practices). While MCSO provided us with rosters showing that most of its deputies have now completed the training, most of the deputies and supervisors we interviewed in January 2011, including those routinely engaged in immigration enforcement policing, either stated that they had never received the training or that they had little to no recollection of what the training was about.

Just as MCSO failed to provide training on how to avoid biased policing, MCSO's training on how to work with LEP inmates has been inadequate. Although there is one reference to language barriers in the MCSO Jail Diversity curriculum, the material is so scant that a detention officer who completed the training just several months prior to his interview did not recall any instruction on the subject.[7]

---

[7] In a July 28, 2011, submission to the Civil Rights Division, MCSO counsel provided a draft copy of a June 2011 PowerPoint entitled "Limited English Proficiency" and an undated nine-page draft "Lesson Plan: Limited English Proficiency." This revised curriculum fails to address many of the deficiencies in MCSO's language service provisions identified in this letter, including, for example, the failure to instruct non-Spanish speaking detention officers on how to make announcements in Spanish, translate inmate forms filled out in Spanish, and communicate with inmates in housing units where the Language Line is unavailable.

-13-

The most egregious deviations from policing norms relate to the way in which MCSO operates the two units most directly involved in its immigration enforcement activities, HSU and CES.  Standard police procedures require MCSO to provide additional oversight over the activities of these two units because of the sensitive nature of their work.  But MCSO has provided deputies in these units with little in the way of policy guidance, training, or oversight.  For example, HSU relies heavily on pretextual stops, but has no meaningful policies discussing when pretextual stops are appropriate, their legality, or any other aspect of their conduct.  As such, MCSO has failed to appreciate the need to develop critical protocols to ensure compliance with important constitutional and statutory requirements.

With regard to correctional standards, MCSO has failed to meet its LEP obligations under Title VI, the regulations implementing Title VI, or the standards that MCSO set for itself to satisfy these obligations.  On June 14, 2010, over a year after we had informed MCSO of our investigation into its treatment of Latino LEP inmates, MCSO issued a Position Statement in which it represented to the United States that it had taken a number of measures to ensure language access for its LEP inmates.  However, when we toured MCSO's jail facilities in January 2011, we discovered that the Statement was inconsistent with the actual state of affairs at the jails.  For example, contrary to the Statement's representations, detention officers refused to accept written requests by inmates in Spanish, failed to use or rely upon a Foreign Language Skills Roster, and continued to rely on inmates to provide other inmates with language assistance.  They also failed to use an available telephonic interpretation service or to request bilingual colleagues to assist them in communicating with LEP inmates.  We find that MCSO's practice of relying on inmates to interpret or translate is dangerous for both inmates and detention officers and is a departure from generally accepted correctional practices.

**E.     Retaliatory Actions**

We find that MCSO command staff and deputies have engaged in a pattern or practice of retaliating against individuals for exercising their First Amendment right to free speech.  Under the direction of Sheriff Arpaio and other command staff, MCSO deputies have sought to silence individuals who have publicly spoken out and participated in protected demonstrations against the policies and practices of MCSO—often over its immigration policies.  MCSO command staff and deputies have arrested individuals without cause, filed meritless complaints against the political adversaries of Sheriff Arpaio, and initiated unfounded civil lawsuits and investigations against individuals critical of MCSO policies and practices.

- One of the victims of MCSO's retaliatory practices is C.C., an organizer with an immigration rights community organization who for several years has engaged in public speech critical of MCSO's practices and its treatment of Latinos.  On July 29, 2010, C.C. participated in a peaceful protest against MCSO.  During the course of the protest, MCSO arrested him and charged him with failure to obey a police officer and blocking a public thoroughfare.  C.C. was released that night.  On July 30, 2010, C.C. stood across the street from the Lower Buckeye Jail watching another protest.  A video recording of the incident shows six or more MCSO deputies approaching and then arresting C.C., who was simply standing with his hands by his side at the time.  Chief Sands stated that C.C. was arrested for violating his order of release.  As the

-14-

incident unfolded, Sheriff Arpaio posted a series of approving messages on a social networking site.

C.C. was detained at the Fourth Avenue Jail, pending his initial court appearance, and not allowed to speak to his attorney while there.  MCSO deputies charged him with obstructing a judicial proceeding, but on August 3, 2010, then-Maricopa County Attorney Rick Romley dropped the charge, admitting that there was no probable cause for the arrest.

MCSO deputies also retaliated against members of Maricopa Citizens for Safety and Accountability ("MCSA"), an organization highly critical of what they called MCSO's discriminatory treatment of Latinos.  In December 2008, during two separate public meetings of the County Board of Supervisors, MCSO deputies arrested members of MCSA when the MCSA members attempted to express their opposition to certain MCSO actions.  The individuals arrested were all charged with criminal trespassing, and some were also charged with disorderly conduct.  None of the charges resulted in convictions, and those charged subsequently filed a lawsuit against Maricopa County and MCSO for wrongful arrest, malicious prosecution, and civil rights violations.  On July 6, 2010, the parties reached a mediated settlement.

Finally, MCSO officials have resorted to using official harassment to silence MCSO's critics.  Between October 2007 and November 2009, former Chief Deputy David Hendershott filed, in his official capacity, unfounded complaints with the Arizona State Bar against five attorneys, alleging that they had engaged in ethical violations.  Each of the complaints was filed against individuals who made public statements critical of MCSO's jail policies, investigatory tactics, and/or police practices.

Similarly, on November 30, 2009, Hendershott, acting in his official capacity, filed four complaints with the Arizona Commission on Judicial Conduct against judges who had made critical public comments about MCSO and Sheriff Arpaio or had rendered decisions detrimental to MCSO's interests.  All of these bar and judicial complaints were dismissed as insufficient to warrant even an investigation.

In a related action, Sheriff Arpaio participated as a named plaintiff in a civil federal racketeering suit filed against the same judges targeted by Hendershott, as well as a number of other County officials.  The claims against the judges echoed those claims in the complaints filed by Hendershott.  The suit was eventually abandoned.

The arrests and harassment undertaken by MCSO have been authorized at the highest levels of the agency and constitute a pattern of retaliatory actions intended to silence MCSO's critics.

## F.    Additional Areas of Serious Concern

In addition to the violations of the Constitution and federal law described above, there are three additional areas of serious concern where, at the moment, we do not make a formal pattern or practice finding, but our review continues.  These areas of concern are:

-15-

- Use of excessive force against Latinos;
- Reduction of policing services to the Latino community; and
- Gender and/or national origin bias by failing to adequately investigate sex crimes.

These three issues are of concern standing alone and may also relate to our ultimate findings concerning MCSO's discriminatory police practices. A deliberate failure to provide policing services, or a deliberate indifference to public safety needs of certain communities, implicates important constitutional protections and can compromise public safety and undermine public confidence in MCSO. It does not matter for the purposes of the Constitution and federal laws whether it is an act of commission or omission.

With regard to use of force, our investigation revealed multiple instances of MCSO deputies using excessive force, a troubling trend made more problematic by MCSO's failure to have in place meaningful systems of accountability and supervision. Such systems are also crucial components in deterring and addressing the use of excessive force, and their absence is a glaring flaw in MCSO's institutional practices relating to the use of force. MCSO's use of excessive force may constitute a pattern or practice of Fourth Amendment violations under Section 14141, and our investigation into this conduct is ongoing.

- In February 2009, D.D., a Latino U.S. citizen, was driving home when a trailing MCSO deputy turned on his emergency lights to signal a traffic stop, allegedly for a failed brake light on D.D.'s vehicle. The MCSO deputy did not activate his siren, and D.D. drove the remaining short distance to his house because he feared how the MCSO deputy would treat him because of his Latino ethnicity. When D.D. exited his car, the MCSO deputy purposefully struck D.D. with his patrol car, pinning D.D. under the vehicle and dragging him for more than ten feet. The MCSO deputy did not attempt to remove D.D., and instructed other arriving deputies to "leave him there." D.D. was eventually extracted by the local fire department. The deputy's actions caused serious injury, including broken bones, burns, and other injuries. D.D. sued MCSO for his injuries; the lawsuit was eventually settled for $600,000. The MCSO deputy claimed that the incident was an accident arising from D.D. attempting to flee his vehicle. MCSO arrested the deputy, and he was charged with aggravated assault.

- In May 2009, an MCSO deputy stopped E.E., a Latino U.S. citizen, after E.E. picked up a Latino day laborer. The deputy told E.E. that he had pulled him over for speeding, but E.E. suspected that he had been pulled over because of his and his passenger's Latino ethnicity. E.E. questioned the deputy's reason for pulling him over. The deputy, along with other MCSO deputies who had arrived on the scene, responded by forcibly removing E.E. from his vehicle, twisting his arm, head, and neck and causing E.E. to fall and hit his face on the pavement. The MCSO deputies kept E.E. on the ground, handcuffed him, and searched him. E.E. was bleeding from multiple lacerations to his face, and experienced neck and back pain from the holds the MCSO deputies had used to remove him from his vehicle. E.E. was ultimately taken to a medical facility where he received treatment for injuries to his face, neck, shoulder, and back. E.E. was never charged with any offense that might explain the officers' use of force. Instead, E.E. was charged with criminal speeding and failure to produce identification. Both of these charges were eventually dropped.

We continue to investigate whether MCSO has implemented its immigration enforcement program with deliberate indifference to the way in which the program compromises MCSO's ability to provide effective policing services to Maricopa County's Latino population. There are indicators that MCSO has undermined its own ability to engage in effective policing in the Latino community. Much of a modern-day police agency's effectiveness is predicated on building a relationship of trust with all segments of the community. MCSO has done almost nothing to build such a relationship with Maricopa County's Latino residents. The absence of trust has substantially compromised effective policing by limiting the willingness of witnesses and victims to report crimes and speak to the police about criminal activity.

MCSO deputies we interviewed admitted that the immigration enforcement program, which lacks basic accountability and quality control measures and is characterized by wide-ranging and poorly planned "crime suppression" operations, has adversely affected their ability to obtain information and cooperation from the County's Latinos. One deputy informed us that MCSO's "aggressive" immigration interdiction efforts create a "wall of distrust" that divides the Latino community and MCSO. Another deputy was told by his supervisors to expect that he would encounter hostility from people who believed they were being stopped because of their ethnicity. A different MCSO deputy bemoaned the impact of MCSO's immigration-related operations, stressing that they "affect our ability to work in a community that hates you." The Police Executive Research Forum, an independent, national organization made up of police executives, interviewed a number of law enforcement officers in Maricopa County who believe that MCSO has enforced immigration laws in a way that has poisoned the relationship between law enforcement and Latinos, hindering general law enforcement efforts within the Latino community.[8] Our investigation further found no evidence that MCSO has acted to improve its relationship with the Latino community, preferring instead to simply continue the practices that have compromised its effectiveness in the Latino community.

Finally, we are continuing our review of allegations that MCSO has failed to investigate a large number of sex crimes.[9] The Sheriff's office has acknowledged that 432 cases of sexual assault and child molestation were not properly investigated over a three-year period ending in 2007.[10] These cases only came to light after a review by the El Mirage Police Department of a period in which MCSO was under contract to provide policing services to that community. It appears that many of the victims may have been Latino. If established, this may constitute a failure to provide police services in a manner that constitutes gender and/or national origin discrimination in violation of the Equal Protection guarantee of the United States Constitution.[11] Our review will not be limited to the pre-2007 cases, but include any allegations that the practice continued after that time.

---

[8] Debra A. Hoffmaster, *et al.*, *Police and Immigration: How Chiefs are leading their communities through the challenges*, Police Executive Research Forum 39 (2010).

[9] Gabrielson, *supra* note 4; Billeaud, *supra* note 4.

[10] *Sheriff Joe Arpaio apologizes for botched El Mirage sex-crime cases*, Associated Press, Dec. 5, 2011, *http://www.azcentral.com/news/articles/2011/12/05/20111205arpaio-apologizes-botched-cases.html*.

[11] *See* Investigation of the New Orleans Police Department, U.S. Department of Justice, Civil Rights Division., pp. 43-49.  March 16, 2011, *http://www.justice.gov/crt/about/spl/nopd.php*.

# LEGAL DISCUSSION

## A.    Discriminatory Policing

Section 14141, a provision of the Violent Crime Control and Law Enforcement Act of 1994, grants the United States a cause of action to sue a state or local government for equitable and declaratory relief when a "governmental authority . . . engage[s] in a pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States."

An agency such as MCSO violates the Equal Protection Clause when its decision-maker adopts a facially neutral policy or practice with a discriminatory intent, and that policy or practice has a discriminatory effect. *Washington v. Davis*, 426 U.S. 229, 239-40 (1976). While discriminatory intent need not be the only motive, an Equal Protection violation occurs when the circumstantial evidence shows that a policy at issue was adopted "because of, not merely in spite of, its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). To assess whether intentional discrimination infected the decision-making process, courts look to the totality of the circumstances with particular attention to factors that the Supreme Court has identified as most probative of discriminatory intent. *Village of Arlington Heights v. Metro. Hous. Redev. Corp.,* 429 U.S. 252 (1977). Those factors include:  evidence of discriminatory effect; evidence of departures from normal procedures; the specific sequence of events that led to the discriminatory practices at issue; and contemporaneous statements from a decision-maker that reveal a discriminatory intent. *Id.* at 266-68.

As described above, our investigation uncovered substantial evidence of the kind identified by the Supreme Court in *Arlington Heights*, showing that Sheriff Arpaio has intentionally decided to implement his immigration program in a manner that discriminates against Latinos. Our evidence further shows that discrimination against Latino persons exists in a wide range of MCSO practices. We have obtained compelling statistical evidence showing that MCSO deputies routinely stop Latinos at much higher rates than similarly situated non-Latinos on Maricopa County roadways. This evidence speaks directly to both the discriminatory effects and discriminatory motives of MCSO deputies engaged in traffic enforcement. It is difficult to conceive of any valid, non-discriminatory explanation for stopping Latino drivers at a rate that is four to nine *times* higher than the rate for similarly situated non-Latino drivers. In addition to this statistical evidence, other data and witness statements show that MCSO deputies, particularly members of the HSU or the CES, frequently detain and/or arrest Latino drivers without cause. Additionally, the evidence of a culture of bias at MCSO discussed above directly relates to the impermissible motives behind the actions of MCSO's deputies. For these and other reasons, the evidence establishes that MCSO is engaged in a pattern or practice of Equal Protection violations.

Discriminatory law enforcement activities are likewise prohibited by Title VI. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance." 42 U.S.C. § 2000d. In addition, Title VI's implementing regulations proscribe "criteria or methods of administration" that exert a discriminatory effect on the basis of race, color, or national origin.

-18-

28 C.F.R. § 42.104(b)(2). For the reasons detailed in the findings section above, the evidence obtained to date establishes that MCSO has violated the aforementioned regulation.

**B.      Unreasonable Seizures**

We conclude that MCSO has engaged in a pattern or practice of conduct by its law enforcement officers that has deprived many of Maricopa County's Latino residents of their right, under the Constitution's Fourth Amendment, to be "secure in their persons, houses, papers, and effects, against unreasonable . . . seizures." U.S. Const. amend. IV. "The 'general Fourth Amendment approach' requires courts to examine the totality of the circumstances to determine whether a . . . seizure is reasonable." *United States v. Guzman-Padilla*, 573 F.3d 865, 876 (9th Cir. 2009) (quoting *United States v. Knights*, 534 U.S. 112, 118 (2001)). To qualify as "reasonable," arrests must be based on probable cause to believe that an arrestee has or is committing a crime, and even brief detentions, such as traffic stops, must be based on reasonable suspicion of criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 20-21 (1968). Reasonable suspicion, at a minimum, means "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. King*, 244 F.3d 736, 738 (9th Cir. 2001).

In this instance, we have both data and witness statements showing that MCSO deputies, in the course of engaging in immigration-related enforcement activities, frequently stop or arrest Latinos without either probable cause or reasonable suspicion. As discussed above, the HSU arrest reports we analyzed provide us with reasonable cause to believe that HSU officers routinely stop Latino motorists without appropriate cause. Moreover, there are a number of other practices related to MCSO's immigration enforcement program that frequently result in Fourth Amendment violations. For example, our investigation revealed that CES deputies typically detain *all* those present within the vicinity of the business they are raiding. In certain instances, these mass detentions of innocent individuals have lasted for extended periods of time, and, in at least one case, lasted for roughly two hours. These types of prolonged detentions of innocent individuals without specific evidence of criminal activity constitute Fourth Amendment violations. *See Ganwich v. Knapp*, 319 F.3d 1115, 1121 (9th Cir. 2003).

**C.      Discriminatory Jail Practices**

Title VI authorizes the United States to initiate civil litigation in federal court for injunctive relief against a recipient of federal financial assistance whose program or activity violates Title VI or its implementing regulations. 42 U.S.C. § 2000d-1; 28 C.F.R. § 42.108. MCSO's language access procedures violate Title VI if MCSO maintains those procedures to intentionally discriminate against Latinos on the basis of their national origin or if the procedures have a discriminatory effect on Latinos. 28 C.F.R. § 42.104(b)(2); *N.Y. Urban League, Inc. v. New York*, 71 F.3d 1031, 1036 (2d Cir. 1995). In this instance, MCSO's language access procedures and practices are intentionally discriminatory and have a discriminatory effect.

Our investigation demonstrates that MCSO's language access procedures intentionally discriminate against Latinos. There is substantial evidence that biases against Latinos have played a role in MCSO's decision to maintain its current language access practices and procedures. MCSO has been on notice for many years of its legal obligation to treat LEP

-19-

inmates in a non-discriminatory manner. In 2002, the Department of Justice issued non-discrimination/LEP language access standards applicable to the correctional functions of law enforcement agencies receiving federal financial assistance, *Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons*, 67 Fed. Reg. 41,455 (June 18, 2002). When accepting grants from the Department, MCSO officials signed assurances promising to abide by Title VI, including an assurance in which MCSO agreed that, "[p]ursuant to Department of Justice guidelines (June 18, 2002 Federal Register (Volume 67, Number 117, pages 41455-72)), under Title VI of the Civil Rights Act of 1964, it will ensure meaningful access to its programs and activities by persons with limited English proficiency." In March 2009, we informed MCSO that we were investigating allegations that its language assistance program in its jails discriminated against Latino LEP inmates, thereby putting MCSO on notice that the United States had received complaints articulating serious concerns relating to its language access program. Finally, grievances filed by Latino LEP inmates, particularly regarding the lack of access to church services, also have placed MCSO on notice as to the absence of services for Latino LEP inmates. Although MCSO has ample reason to know that its policies are denying Latino LEP inmates access, MCSO persists in maintaining many of its discriminatory practices.

MCSO's language access procedures and practices have a discriminatory effect upon MCSO's LEP inmates. As detailed above, MCSO's LEP inmates, who are overwhelmingly Latino, do not receive the same services and benefits as non-LEP inmates, are pressured to sign important immigration-related documents without language assistance, and are singled out for punishments, such as being subjected to lockdowns and disciplinary segregation for failing to understand English commands. In all of these ways and more, MCSO's language access practices disproportionately and adversely impact the Latino inmates in MCSO's jails. *See Lau v. Nichols*, 414 U.S. 563, 568 (1974) (noting that "[i]t seems obvious that the Chinese-speaking minority receive fewer benefits than the English-speaking majority from respondents' school system which denies them a meaningful opportunity to participate in the educational program—all earmarks of the discrimination banned by" Title VI and applicable regulations); *Yniguez v. Arizonans for Official English*, 69 F.3d 920, 947-48 (9th Cir. 1995), *vacated on other grounds*, 520 U.S. 43 (1997) (striking down the English-only amendment to the Arizona Constitution, stating that the amendment's impact "is especially egregious because it is not uniformly spread over the population, but falls almost entirely upon Hispanics and other national origin minorities").

**D.    Retaliatory Practices**

We find that MCSO has violated Section 14141 by engaging in a pattern or practice of conduct by its law enforcement officers that has deprived a number of Maricopa County residents of their First Amendment rights. The First Amendment prohibits government actors from "abridging the freedom of speech," U.S. Const. amend. I, and prohibits a government official from subjecting an individual to retaliatory actions for speech that falls under the protections of the First Amendment. *Hartman v. Moore*, 547 U.S. 250, 251 (2006). The Ninth Circuit has held that to prove a First Amendment retaliation claim, a plaintiff must show "that by his actions [the defendant] deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct." *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999). To succeed in bringing a

First Amendment retaliation claim, courts have held that plaintiffs must show only that "an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Id.* The plaintiff must also show that the "chilling effect was a but-for cause of the defendant's action." *Skoog v. County of Clackamas*, 469 F.3d 1221, 1232 (9th Cir. 2006).

In this case, we have identified instances of retaliatory actions by MCSO officials. Some of the most serious incidents involve MCSO deputies, at times apparently acting at the direction of MCSO's leadership, bringing false criminal charges against MCSO's critics. The fact that all of the charges are subsequently dismissed strongly suggests that the "chilling effect was [the] but-for cause" of the police action. Moreover, such maliciously motivated charges would have the effect of silencing a person of ordinary firmness from engaging in future protected speech. Based on our review of the evidence, there is reasonable cause to believe that MCSO officials have committed a series of retaliatory actions directed at perceived critics of MCSO that are designed to chill the exercise of protected First Amendment activities.

## REMEDIAL MEASURES

The factual findings detailed above provide reasonable cause to believe that MCSO has committed violations of the First, Fourth, and Fourteenth Amendments to the United States Constitution, Section 14141, and Title VI. The Civil Rights Division accordingly notifies you that, absent MCSO taking clear steps toward reaching an agreement with the Division to correct these violations in the next 60 days, the United States will conclude that voluntary compliance is not possible and will initiate civil litigation to compel compliance with Section 14141 and Title VI. Should MCSO indicate within those 60 days that it does not intend to work with the Division, we may initiate suit in fewer than 60 days. MCSO is further cautioned not to intimidate, threaten, coerce, or engage in other discriminatory conduct against anyone because he or she has either taken action or participated in an action to secure rights protected by the civil rights laws we enforce.

The constitutional violations and institutional deficiencies highlighted above are the product of an ingrained culture that encourages and tolerates the discriminatory treatment of Latino persons and an agency that lacks the requisite policies and practices to ensure effective and constitutional law enforcement. Reform will require sustained commitment to long-term structural, cultural, and institutional change, including, but not limited to, the following:

- Training for Deputies: MCSO must develop effective and meaningful training for deputies in constitutional policing, including how to perform stops, searches, seizures, and arrests consistent with the requirements of the Fourth and Fourteenth Amendments.

- Special Operations and Specialized Units: MCSO must develop and implement detailed policies, procedures, and training regarding (1) special operations, including, but not limited to, crime suppression sweeps or saturation patrols, worksite raids, drop house raids, and roving smuggling patrols, and (2) specialized units, including, but not limited to, SWAT, HSU, and CES.

- <u>Data Collection and Risk Management</u>:  MCSO must develop and implement a data collection system regarding all law enforcement activity in order to enable MCSO to supervise, manage, and intervene, when appropriate.  Such a program requires detailed auditable reports for traffic and pedestrian stops; immigration-related stops, raids, or inquiries; searches and seizures; and worksite raids.

- <u>Complaint System and Internal Affairs</u>:  MCSO must develop and implement a comprehensive complaint, investigation, and disciplinary system to enable it to hold officers accountable when they violate policy and/or the law.  The complaint system must be accessible to all community members and allow the public to make complaints against MCSO staff and deputies without fear of retaliation.  The internal investigative process should include clear avenues for adjudication, discipline, and criminal prosecution, if necessary, as well as access for LEP individuals.

- <u>Language Access</u>:  MCSO must develop and implement a comprehensive language access program for its deputies and officers who encounter LEP individuals in the jails and for its enforcement activity in the community.  Training on this program must be routine and detailed, such that all staff are aware of their language access obligations and are held accountable for failure to implement appropriate measures.

- <u>Community Outreach</u>:  MCSO must meet the law enforcement needs of all its residents, regardless of their race or ethnicity.  To that end, MCSO must engage with and reach out to Maricopa County's Latino residents to ensure that it is fairly and effectively providing them with law enforcement services.

We strongly believe that effective policing and constitutional policing go hand in hand. In recent years, we have worked productively and collaboratively with law enforcement agencies across the country, *increasingly at their request*, to address serious concerns that threaten to undermine public confidence and hinder operational effectiveness.  Our goal in every case is to work collaboratively to obtain a detailed understanding of the precise challenges and their root causes, and to develop and implement sustainable reform measures that will reduce crime, ensure respect for the Constitution, and increase public confidence in law enforcement.  We stand ready to work cooperatively with you to address the concerns outlined in this letter, and we remain prepared to take prompt, appropriate legal action if you choose to forego collaboration.

The violations we have identified are serious, and voluntary compliance with the Constitution and federal law will require a detailed agreement incorporating the foregoing remedial measures.  Given the systemic nature of the constitutional violations, effective compliance in this case will require federal judicial oversight; a court-enforceable agreement will provide the structure, transparency, and accountability necessary to achieve sustained success.

-22-

Please note that this letter is a public document. It will be posted on the Civil Rights Division's website. We look forward to hearing from you soon. If you have any questions, please contact Jonathan Smith, Chief of the Special Litigation Section, at (202) 514-6255.

Sincerely,

Thomas E. Perez
Assistant Attorney General

cc:     William R. Jones, Jr.
        Counsel for Maricopa County Sheriff's Office
        Jones, Skelton & Hochuli, P.L.C.
        2901 North Central Ave, Suite 800
        Phoenix, Arizona  85012

# EXHIBIT C

  

**Homeland Security**

Paula
TSA Officer

About | Blog | Contact Us | Site Map

Search

Home | Counterterrorism | Border Security | Preparedness, Response, Recovery | Immigration | Cybersecurity | News

**News**
En Español
Fact Sheets
Media Contacts
Multimedia
**Press Releases**
Publications
Speeches
Testimony

## Statement by Secretary Napolitano on DOJ's Findings of Discriminatory Policing in Maricopa County

Release Date: December 15, 2011

For Immediate Release
Office of the Press Secretary
Contact: 202-282-8010

"The Department of Homeland Security (DHS) is troubled by the Department of Justice's (DOJ) findings of discriminatory policing practices within the Maricopa County Sheriff's Office (MCSO).   Discrimination undermines law enforcement and erodes the public trust.  DHS will not be a party to such practices. Accordingly, and effective immediately, DHS is terminating MCSO's 287(g) jail model agreement and is restricting the Maricopa County Sheriff's Office access to the Secure Communities program.  DHS will utilize federal resources for the purpose of identifying and detaining those individuals who meet U.S. Immigration Customs Enforcement's (ICE) immigration enforcement priorities.  The Department will continue to enforce federal immigration laws in Maricopa County in smart, effective ways that focus our resources on criminal aliens, recent border crossers, repeat and egregious immigration law violators and employers who knowingly hire illegal labor."

###

*This page was last reviewed/modified on December 15, 2011.*

---

**I Want to**
Check the National Terrorism Advisory System
Find Career Opportunities
Contact the Department
File a Travel Screening Complaint
Learn about biometric identification
Learn about E-Verify

**Popular Searches**
Careers, ESTA, E-Verify, Forms, Green Card, I-9, Internships, Jobs, Passport, Training, Visa

**Featured Components**
Customs and Border Protection
Federal Emergency Management Agency
Immigration and Customs Enforcement
Transportation Security Administration
U.S. Citizenship and Immigration Services
U.S. Coast Guard
U.S. Secret Service
Office of Inspector General

**Resources**
Contracts & Grants
Science & Technology

**Information For**
Travelers
First Responders
Business
Veterans
Students
Government
Citizens

**Connect with DHS**
The Blog @ Homeland Security
Homeland Security Feeds
Homeland Security Tweets
Homeland Security Videos
Follow DHS on Facebook

**About the Department**
Secretary Janet Napolitano
DHS's Recovery.gov
DHS Components and Agencies
Budget, Performance and Accountability
NoFEAR Act Data
DHS's Open Government Initiative

---

Home   Contact Us   Site Map   Privacy Policy   Plug-Ins   Notices   FOIA   USA.gov   GobiernoUSA.gov   The White House

**U.S. Department of Homeland Security**

# EXHIBIT D

DEPARTMENT OF HOMELAND SECURITY (DHS)
## IMMIGRATION DETAINER – REQUEST FOR VOLUNTARY ACTION

| Subject ID:<br>Event #: | File No:<br>Date: |
|---|---|

| TO: (Name and Title of Institution - OR Any Subsequent Law Enforcement Agency) | FROM: (DHS Office Address) |
|---|---|

Name of Subject: _____

Date of Birth: _____  Citizenship: _____  Sex: _____

**1. DHS HAS DETERMINED THAT** *(mark at least one option in subsection A and one option in subsection B, or skip to section 2)*:

**A. THE SUBJECT IS AN IMMIGRATION ENFORCEMENT PRIORITY BECAUSE HE/SHE:**

☐ has engaged in or is suspected of terrorism or espionage, or otherwise poses a danger to national security;

☐ has been convicted of an offense of which an element was active participation in a criminal street gang, as defined in 18 U.S.C. § 521(a), or is at least 16 years old and intentionally participated in an organized criminal gang to further its illegal activities;

☐ has been convicted of an offense classified as a felony, other than a state or local offense for which an essential element was the alien's immigration status;

☐ has been convicted of an aggravated felony, as defined under 8 U.S.C. § 1101(a)(43) at the time of conviction;

☐ has been convicted of a "significant misdemeanor," as defined under DHS policy; and/or

☐ has been convicted of 3 or more misdemeanors, not including minor traffic offenses and state or local offenses for which immigration status was an essential element, provided the offenses arise out of 3 separate incidents.

**B. PROBABLE CAUSE EXISTS THAT THE SUBJECT IS A REMOVABLE ALIEN. THIS DETERMINATION IS BASED ON:**

☐ a final order of removal against the subject;

☐ the pendency of ongoing removal proceedings against the subject;

☐ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☐ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**2. DHS TRANSFERRED THE SUBJECT TO YOUR CUSTODY FOR A PROCEEDING OR INVESTIGATION.**

☐ Upon completion of the proceeding or investigation for which the subject was transferred to your custody, DHS intends to resume custody of the subject to complete processing.

**IT IS THEREFORE REQUESTED THAT YOU:**

- Serve a copy of this form on the subject and maintain custody of him/her for a period **NOT TO EXCEED 48 HOURS** beyond the time when he/she would otherwise have been released from your custody to allow DHS to assume custody. **This request takes effect only if you serve a copy of this form on the subject, and it does not request or authorize that you hold the subject beyond 48 hours. This request arises from DHS authorities and should not impact decisions about the subject's bail, rehabilitation, parole, release, diversion, custody classification, work, quarter assignments, or other matters.**

- As early as possible prior to the time you otherwise would release the subject, please notify DHS by calling ☐ U.S. Immigration and Customs Enforcement (ICE) or ☐ U.S. Customs and Border Protection (CBP) at _____
If you cannot reach an official at the number(s) provided, please contact the Law Enforcement Support Center at: (802) 872-6020.

- Notify this office in the event of the subject's death, hospitalization or transfer to another institution.

☐  If checked: Please cancel the detainer related to this subject previously submitted to you on _____ (date).

| _____<br>(Name and title of Immigration Officer) | _____<br>(Signature of Immigration Officer) |
|---|---|

**Notice:** If the subject is taken into DHS custody, he or she may be removed from the United States. If the subject may be the victim of a crime or you want the subject to remain in the United States for a law enforcement purpose, please notify the ICE Law Enforcement Support Center at (802) 872-6020. You may also call this number if you have any other questions or concerns about this matter.

**TO BE COMPLETED BY THE LAW ENFORCEMENT AGENCY CURRENTLY HOLDING THE SUBJECT OF THIS NOTICE:**

Please provide the information below, sign, and return to DHS by mailing, emailing, or faxing a copy to _____.

Local Booking/Inmate #: _____ Est. release date/time: _____ Date of latest criminal charge/conviction: _____

Latest offense charged/convicted: _____

This Form I-247D was served upon the subject on _____, in the following manner:
    ☐ in person        ☐ by inmate mail delivery        ☐ other (please specify): _____.

| _____<br>(Name and title of Officer) | _____<br>(Signature of Officer) |
|---|---|

DHS Form I-247D (5/15)

## NOTICE TO THE DETAINEE

The Department of Homeland Security (DHS) has placed an immigration detainer on you. An immigration detainer is a notice to a law enforcement agency that DHS intends to assume custody of you (after you otherwise would be released from custody) because there is probable cause that you are subject to removal from the United States under federal immigration law. DHS has requested that the law enforcement agency that is currently detaining you maintain custody of you for a period not to exceed 48 hours beyond the time when you would have been released based on your criminal charges or convictions. **If DHS does not take you into custody during this additional 48 hour period, you should contact your custodian** (the agency that is holding you now) to inquire about your release. **If you have a question or complaint regarding this detainer, please contact the ICE ERO Detention Reporting and Information Line at (888) 351-4024. For complaints related to alleged violations of civil rights or civil liberties connected to DHS activities, please contact the Joint Intake Center at (877) 2INTAKE (877-246-8253). If you believe you are a United States citizen or the victim of a crime, please advise DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.**

## NOTIFICACIÓN AL DETENIDO

El Departamento de Seguridad Nacional (DHS) ha emitido una orden de detención inmigratoria en su contra. Una orden de detención inmigratoria es un aviso a la autoridad de seguridad pública que DHS tiene la intención de asumir custodia sobre usted (después que normalmente hubiera sido liberado de su custodia) porque existe causa probable que usted esté sujeto a ser removido de los Estados Unidos bajo la ley federal de inmigración. DHS ha pedido que la autoridad de seguridad pública que actualmente lo tiene detenido lo / la mantenga en su custodia por un período que no sobrepase 48 horas después del momento cuando usted hubiera sido liberado basado en sus cargos o condenas criminales. **Si DHS no lo toma bajo su custodia durante este período adicional de 48 horas, usted debe contactar a la agencia responsable por su custodia** (la que actualmente lo tiene detenido) para preguntar acerca de su liberación. **Si usted tiene alguna pregunta o queja concerniente a esta orden de detención, por favor contacte la Línea para Reportar e Información de ICE ERO al (888) 351-4024. Para quejas relacionadas a violaciones alegadas de derechos civiles o libertades civiles conectadas a las actividades de DHS, por favor contacte al Joint Intake Center (Centro de Admisión) al (877) 2INTAKE (877-246-8253). Si usted cree ser un ciudadano de los Estados Unidos o víctima de un crimen, por favor avísele a DHS llamando gratis al ICE Law Enforcement Support Center (Centro de Apoyo de ICE para las Agencias para el Cumplimiento de la Ley) al (855) 448-6903.**

## AVIS AU DETENU

Le Département de la Sécurité Nationale (en anglais: DHS) a émis un ordre d'arrêt d'immigration contre vous. Un ordre d'arrêt d'immigration est un avis à un organisme d'application de la loi que DHS a l' intention d'assumer votre garde (après votre libération) car il existe cause probable que vous soyez sujet à l'expulsion des Etats-Unis en vertu du droit fédéral de l'immigration. DHS a demandé à l'agence d'application de la loi qui actuellement vous détient, de vous maintenir sous garde pendant une période n'excédant pas 48 heures après avoir été libéré en fonction des accusations ou condamnations criminelles contre vous. **Si DHS ne vous prend pas en garde à vue au cours de cette période de 48 heures supplémentaires, vous devez contacter votre gardien** (l'agence qui vous retient aujourd'hui) pour enquérir au sujet de votre libération. **Si vous avez une question ou une complainte au sujet de cette demande, veuillez contacter la Ligne pour Rapporter et d'Information de ICE ERO au (888) 351-4024. Pour les plaintes relatives à des violations présumées des droits et libertés civils liés à des activités de DHS, veuillez contacter Joint Intake (Centre d'Admissions) au (877) 2INTAKE (877-246-8253). Si vous croyez que vous êtes un citoyen américain ou victime d'un crime, veuillez prévenir DHS, en appelant gratuitement ICE Law Enforcement Support Center (Centre d'Appui de ICE pour les Organismes d'Application de la Loi) au 855 448-6903.**

## AVISO AO DETENTO

O Departamento de Segurança Interna (DHS, pela sigla americana) emitiu uma ordem de custódia imigratória em seu nome. Este documento é um aviso enviado às agências de aplicação da lei de que o DHS pretende assumir a custódia da sua pessoa, caso seja libertad. O DHS pediu que a agência de aplicação da lei encarregada da sua atual detenção mantenha-o sob custódia durante, no máximo, 48 horas após o periodo em que seria libertado pelas autoridades estaduais ou municipais de aplicação da lei, de acordo com as respectivas acusações e penas criminais. **Se o DHS nao assumir a sua custódia durante essas 48 horas adicionais, voce deverá entrar em contato com a agência custodiante** (a agência de aplicação da lei ou qualquer outra entidade que esteja detendo-o no momento) para obter informações sobre sua libertação da custódia estadual ou municipal. **Caso voce tenha alguma reclamação a fazer sobre esta ordem de custódia imigratória ou relacionada a violações dos seus direitos ou liberdades civis decorrente das atividades do DHS, entre em contato com o *Joint Intake Center*, que seja o Centro de Entrada Conjunta de Controle de Imigração e Alfândega (ICE, pela sigla americana) pelo telefone 1-877-246-8253. Se você acreditar que é cidadao dos EUA ou está sendo vítima de um crime, informe ao DHS, ligando para o *Law Enforcement Support Center*, que seja o Centro de Apoio para Aplicação da Lei do ICE pelo telefone de ligação gratuita (855) 448-6903.**

### THÔNG BÁO CHO NGƯỜI ĐANG BỊ GIAM

Bộ An ninh Nội địa Mỹ (DHS) có lệnh giam giữ ông/bà vì lý do liên quan đến luật di trú. Lệnh giam giữ vì lý do liên quan đến luật di trú là thông báo của DHS cho các cơ quan thi hành luật pháp là DHS có ý định dành thẩm quyền để tạm giữ ông/bà (sau khi ông/bà được thả). Lý do là, theo luật di trú của liên bang Mỹ, DHS có lý do chính đáng để xếp ông/bà vào diện có thể bị trục xuất ra khỏi Mỹ.  DHS đã yêu cầu cơ quan thi hành luật pháp, nơi đang giam ông/bà, phải tiếp tục giam ông/bà thêm cho đến tối đa không được quá 48 tiếng đồng hồ, thời điểm mà ông/bà coi như đã được thả, căn cứ vào lời buộc tội hoặc bản án kết tội của tòa.  **Nếu trong vòng 48 tiếng đồng hồ bổ sung này mà DHS không đến nhận ông/bà, thì ông/bà nên liên lạc với nhân viên quản lý của mình** (nơi đang giam giữ ông/bà) để biết chi tiết về vấn đề được thả ra khỏi nhà giam.  **Nếu ông/bà có thắc mắc hoặc khiếu nại về lệnh tạm giữ này, xin liên lạc với ICE ERO Detention Reporting and Information Line ở số (888) 351-4024.  Nếu ông/bà có phàn nàn về các hoạc động, công tác của DHS mà ông/bà cho là có vi phạm đến dân quyền hoặc tự do dân quyền, xin liên lạc Joint Intake Center ở số (877) 2INTAKE (877-246-8253).  Nếu ông/bà tin rằng mình có quốc tịch Mỹ, hoặc mình là nạn nhân trong vụ tội, xin gọi ICE Law Enforcement Support Center ở số điện thoại miễn phí (855) 448-6903 để báo cho DHS biết.**

## 對扣留者的通告

美国国土安全部（DHS）已發出一張扣留令，對你進行扣留。 移民扣留令的目的是告訴执法機關現在DHS 有權力扣押你（在你被关押的部门释放之後）因为根据美国联邦移民法，我們有顏能成立的因由可將你遣送出境。DHS 已向扣留你的有關執法機關提出要求在你刑事控罪及定罪後被释放的48小時內對你继续进行扣留。如果在這48小时内DHS没有扣押你，那你可以联络你的保管人（现关押你的部门）查询有關你釋放的事。 如果你對這扣留令有任何问题或投诉，请联络ICE ERO 拘留报告信息熱线 （888）351-4024。任何有關DHS涉嫌违反民权或民权自由行為的投訴，请联系美国移民及海关执法局联合接待中心（ICE Joint Intake Center）（877）2INTAKE（877-246-8253）。如果你相信你是美国公民或是受害者，请联系美国移民及海关执法局的执法支援中心（ICE Law Enforcement Support Center）告知DHS，其免费电话号码是（855）448-6903。

# EXHIBIT E

*Office of the Director*

U.S. Department of Homeland Security
500 12th Street, SW
Washington, D.C. 20536



U.S. Immigration
and Customs
Enforcement

FEB 2 5 2014

The Honorable Mike Thompson
U.S. House of Representatives
Washington, D.C. 20515

Dear Representative Thompson:

Thank you for your recent letter to the Department of Homeland Security (DHS) regarding immigration detainers.

As you know, Form I-247, Immigration Detainer–Notice of Action, is a notice that U.S. Immigration and Customs Enforcement (ICE), within DHS, has reason to believe that an alien may be subject to removal from the United States. By issuing a detainer, ICE requests that an LEA maintain custody of an alien for a period not to exceed 48 hours (excluding Saturdays, Sundays, and federal holidays) after he or she would otherwise be released by an LEA, to provide time for ICE to assume custody. While immigration detainers are an important part of ICE's effort to remove criminal aliens who are in federal, state, or local custody, they are not mandatory as a matter of law. As such, ICE relies on the cooperation of its law enforcement partners in this effort to promote public safety.

ICE uses detainers to help focus its limited resources on its public safety, national security, and border security missions. ICE's use of detainers is focused on the most serious criminal offenders. ICE limits the use of detainers against individuals arrested for minor misdemeanor offenses (e.g., traffic offenses and other petty crimes) who are not otherwise ICE priorities, helping to ensure that limited available resources are focused on apprehending felons, repeat offenders, and immigration violators who fall under other ICE priorities.

To ensure clarity with law enforcement partners and the public, information about immigration detainers is publically available online at http://www.ice.gov/news/library/factsheets/detainer-faqs/htm. The site also provides a link to Form I-247. Additionally, a short video briefing for front-line state and local law enforcement personnel describing ICE's use of immigration detainers and extensive supporting materials for law enforcement leadership are available at http://www.ice.gov/secure_communities/crcl.htm.

The Honorable Mike Thompson
Page 2

     Thank you once again for your letter.  The co-signers of your letter will each receive a separate, identical response.  Should you need additional assistance, please do not hesitate to contact me at (202) 732-5907.

                     Sincerely,

                     Daniel H. Ragsdale
                     Acting Director

# EXHIBIT F

 

Conflict & Justice

# 'Detained because my name was Gonzalez'

*March 25, 2016 · 2:15 PM EDT*

By Angilee Shah

    Comment

*This story is a part of*


GlobalNation
STORIES OF A CHANGING AMERICA AND ITS PEOPLE



Jacinta Gonzalez locked herself to a vehicle on Mar. 19 to block the road to a Trump rally in Fountain Hills, Arizona. She was arrested with two other protestors, who were released that night. She was held detained overnight at the request of US Immigration and Customs Enforcement. Gonzalez is a US citizen.

Credit: Diane Ovalle/Mijente

*Continue reading below*



When Jacinta Gonzalez arrived at a protest on Shea Boulevard in Fountain Hills, Arizona, the morning of March 19, it wasn't just for a Trump rally. It was because of a kind of Trump ideology.

"We decided to take action and shut down Trump because we understand that he's more than just a candidate," she says.

Gonzalez talks about the "Trump effect" almost as much Donald Trump himself. She worries he is "riling up" politics of racism, Islamophobia and homophobia.

"We've already seen it permeate our community," she says, pointing to bills related to immigration and refugees in state and local governments. There are four such bills in Arizona's house and one in the senate, which critics say curtail immigrants' rights and foment racial divides.

Protesters' vehicles blocked the highway that led to the rally until they were towed about 45 minutes later, she estimates. Then, she joined a few other protesters who chained themselves to vehicles. They were able to further delay traffic for about an hour, and traffic backed up for a mile.

Predictably, Gonzalez was arrested, along with two other protestors. She was ready for that. Gonzalez, 30, has been an activist on immigration and deportation issues for 10 years. She's the field director for Mijente, an organization born largely from the #Not1MoreDeportation campaign that now advocates for issues that matter to Latinos, broadly.

The three protestors were taken to the Fourth Avenue jail in Phoenix, about 30 miles away. The jail is part of the Maricopa County Sheriff's Office, which is led by Trump supporter Sheriff Joe Arpaio. Arpaio introduced Trump at his Fountain Hills rally that day. He announced that the three protestors were in jail and said, "If they think they're going to intimidate you and the next president of the United States, it's not going to happen. Not in this town, I tell you right now."

"You have some sheriff. There's no games with your sheriff, that's for sure," Trump told the crowd when he took the stage.

Arpaio is known for his aggressive targeting of undocumented immigrants. In 2012, the US Justice Department sued Arpaio for racial profiling of Latinos. Maricopa County opted for a settlement last July. Under the terms of the settlement, the sheriff's office must "establish an official policy prohibiting retaliation against any individual for any individual's lawful expression of ideas in the exercise of the First Amendment right to the freedom of speech."

Gonzalez and the two other protesters were in the booking area together, where they were processed, fingerprinted and patted down. That's when, she says, two agents called her by name to come up to the counter. Gonzalez says she was the only one in the booking area who was called up. They began asking questions including, "What's your immigration status?"

Gonzalez replied, "I want an attorney present to answer your questions."

"Oh, so you're illegal," one of the agents replied, she recalls. They asked if she is a citizen. She refused to answer. She had provided her Louisiana drivers license, name and date of birth — enough to check databases and verify her status.

The agents then told her that they were issuing an immigration detainer, which is a request by ICE for the Maricopa County Sheriff's Office to hold a suspect and turn him or her over to immigration officials once they complete their investigation.

Chris Hegstrom, the director of public information for the Maricopa County Sheriff's Office, says this was all standard procedure. The ICE agents are stationed at the Fourth Avenue jail and question everyone who comes through, he says.

"If you were arrested today, you would be interviewed by ICE," Hegstrom says. "If I were arrested, I too would be interviewed by ICE."

The two other protestors, both white men, told The Republic they were never questioned by the agents nor were they asked about their immigration status.

About 8 p.m., the three protestors were seen by a judge. They were released on their own recognizance and will face misdemeanor charges for obstructing a highway. By late that night, 11 p.m. or midnight, Gonzalez estimates, the jail finished processing them. The two other protestors were released; Gonzalez was kept in jail overnight, in isolation, she says.



Mugshots for Jacinta Gonzalez, Michael Cassidy and Ben Laughlin, the three protestors arrested at an anti-Trump rally in Fountain Hills, Arizona on Mar. 19. They were processed at the Fourth Avenue jail in Phoenix.

Credit: Maricopa County Sheriff's Office

Hegstrom says ICE requested the jail hold Gonzalez until they came to pick her up. Other agencies have to follow different rules to have the sheriff's office hold someone in jail. "When a local agency wants to place a hold on somebody they have to show us a probable cause statement to show us why they want us to hold them. ICE does not," he says. "When they put a hold on somebody, we don't know why."

"We processed [the three protestors] like everybody else. We have nothing to do with ICE," he says.

**Also:** _Many women seeking asylum in the US have been released from detention — but with ankle monitors_

In the morning, ICE agents came to claim Gonzalez. Hegstrom says this kind of handover to ICE happens once each day, in the morning. They shackled her and took her to the Phoenix field office where they began to question her. Again, she refused to answer questions. They allowed her to call her attorney. Before her counsel could arrive, less than 30 minutes later, they told her that they know she is a US citizen and let her go.

Yasmeen Pitts O'Keefe, spokesperson for ICE in Phoenix, said by email that ICE agents stationed at the Fourth Avenue jail questioned all three protestors.

"Of the three individuals arrested by local authorities at Phoenix political rallies this weekend who were booked into the jail, two advised ICE officers during their interviews they were US citizens. As such, ICE took no further enforcement action," she writes. "The third individual declined to provide ICE officers information, other than acknowledging being foreign born. As a result, that person was subsequently transferred to ICE custody. However, the individual was released within an hour after database checks determined the person currently holds a valid United States passport."

Last fall, the Department of Homeland Security outlined new priorities for detention and deportation, which say resources should be dedicated as much as possible to people who are threats to public safety and have committed multiple crimes. The guidelines, known as PEP, also led to new immigration detainer forms. So far, ICE has not revealed which form was used in this case, or are used generally in Maricopa County jails. PRI has made a Freedom of Information Act request for documents related to ICE's current relationship with the sheriff's office and the types and numbers of detainers that are issued.

Cecillia D. Wang, director of the ACLU Immigrants' Rights Project, says what happened to Gonzalez is part of ongoing issues with the sheriff's office and their relationship with ICE. In 2013, Arpaio and his office lost a class-action lawsuit brought by the ACLU for racially profiling Latinos in traffic stops.

In 2011, the federal government withdrew agreements with Maricopa County that deputized local officers to assist in immigration enforcement. This restricted the sheriff's access to databases, but did not preclude them from complying with ICE requests.

"What happened to this woman should serve as a warning sign to the federal government that they shouldn't be doing business with Arpaio, they shouldn't be issuing detainers," says Wang. "Issuing detainers is widely know to give local agencies the incentive to make arrests for minor violations of state law in order to get people into the jail."



Maricopa County Sheriff Joe Arpaio listens to US Republican presidential candidate Donald Trump speak at a campaign rally in Marshalltown, Iowa January 26, 2016. Arpaio endorsed Trump at the rally.

Credit: Brian Snyder/Reuters

Christopher Lasch, a professor at Sturm College of Law at the University of Denver who studies the use of detainers, says cooperation between ICE and local law enforcement to detain people is troubling. The Fourth Amendment protects people from unreasonable search and seizure, and that ICE does not have to show cause to detain someone is a violation of that right, he says.

"This case shows what a lot of people worry about, that in fact they don't do any investigations before they issue a detainer," says Lasch. "The problem is that there's just an open question as to whether they have in fact have decided to follow the Fourth Amendment."

Gonzalez believes she was racially profiled, that she was singled out because of her name and her appearance. "ICE agents across the country, both inside and outside of jails, are accustomed to racial profiling — to asking people questions without attorneys present, without them knowing their constitutional rights," she says.

"They want to put the burden of proof on you, instead of doing their jobs," Gonzalez says. "Folks assume or expect that because you're a citizen, you should just be able to say so and deserve a way of being treated. But we have the burden to defend our constitutional rights."

Those rights include being able to ask for counsel without fear of retaliation, she says.

The night in jail was humiliating and uncomfortable, but Gonzalez is more concerned about other people who are in immigration detention, people who are separated from their families, don't know their rights or don't speak English. And she is worried about what a Trump presidency would mean for constitutional rights in America.

"I'm 10 times more afraid of the pain and uncomfortableness that would come about if Trump becomes president," she says. "I'm more afraid of that than one or two nights in jail."



Comment

In **Conflict & Justice**, **Justice** and **Global Nation**.

Tagged: **North America**   **United States**   **immigration**   **Justice**   **protests**   **Election 2016**   **government**

## Latest in Justice



**Immigrant workers at Harvard dining halls go on strike**

*October 18, 2016*



**American leaders persistently ignored warnings that Afghan government corruption would undo rebuilding**

*October 18, 2016*



**A day in the life of immigration limbo**

*October 18, 2016*



**The best and worst countries to be a girl**

*October 18, 2016*



**Nigeria's #BringBackOurGirls campaign celebrates 21 returnees**

*October 17, 2016*



**French website encourages women in parliament to share experiences of sexism**

*October 17, 2016*

---

| Login |
| --- |

 Write a comment

**10 Comments**                                             Sort  Subscribe  RSS

 **Thomas Smitherman**                              205 days ago

This ridiculous article keeps underlining the right to lawful free political speech and expression. Blocking a highway so that others cannot attend a political rally is NOT LAWFUL and NOT FREE SPEECH.

Like  Reply  Share                                                          1

 **Eric Smaltz**                              206 days ago *(edited)*

I was interviewed by Telemundo journalist Antonia Mejiajust (blue jacket in photo) feet from that clown. Totally race biased reporting had to cut her off asking for just one question that might shed a positive light on Donald Trump. I was in the middle with my american flag feariong nothing from these cowards. A man was stopped from attending an antique clock show and auction, a family in a u-haul was trying to move there belongings to illinois. Worst of all a man was attending to his wife, this 84 year woman was in dibetic shock trying to get home to get her medication.Many folks that were not even going to the rally had their valuable time stolen.

Like  Reply  Share                                                          3

*This comment has been deleted*

1 reply

 **barciur**                              205 days ago

That's a lawsuit waiting to happen. And hopefully it does happen.

Like  Reply  Share                                                          1

 **Thomas Lawyer**                              206 days ago

She was not racially profiled. Was not detained because of her name. Was not held in jail because she asked for an attorney. She was profiled only for her bad behavior and refusal to cooperate. She's a spoiled brat, childish, cry baby! Lesson learned.

Like  Reply  Share  2 replies                                               3

 **barciur**                              205 days ago

bad behavior? refusing an illegal question? OK.

Like  Reply  Share  1 reply                                                 0

 **Thomas Smitherman**                              205 days ago

Asking your legal status is TOTALLY LEGAL.

Like  Reply  Share                                                          1

 **Kevin Carey**                              207 days ago

welcome to Donald Trump's America...2 of my grandchildren have Hispanic last names, should I be worried??

Like  Reply  Share  2 replies

0



**Eric Smaltz**                                                               206 days ago

Welcome to reality . . . if your 2 grandchildren act foolish yes, they should be worried. By my actions in the middle of of those clowns with an American flag I was profiled as well. I heard it on the police radio. "The Native American with the flag is okay he is one of the good ones". I am Apache. Crap like this is not going to happen on my watch. teach you children well and they will be just fine. It's your call.

Like  Reply  Share

2



**Thomas Smitherman**                                                        205 days ago

If they block a highway in Arizona, then maybe.  But I think they can avoid that!

Like  Reply  Share

0



**John Smith1882**                                                           207 days ago

The ICE agents should be detained and prosecuted for failure to uphold their sworn oath to the US Constitution, among other Egregious acts thy committed. Take away their right to own a gun forever.

Like  Reply  Share

0



Hear a different voice. **PRI** Public Radio International

Major funding provided by:

   



Arts, Culture & Media  |  Business, Finance & Economics  |  Conflict & Justice  |  Development & Education  |  Global Politics  |
Health & Medicine  |  Lifestyle & Belief  |  Science, Tech & Environment  |  Sports

About PRI  |  Contact us  |  Meet the PRI.org Team  |  Donate  |  Sponsorship  |  Privacy policy  |  Terms of use

©2016 Public Radio International

# EXHIBIT G

KNXV

**WEATHER    TRAFFIC    ALL SECTIONS**                  Q    88°

# Three protesters arrested at Donald Trump Fountain Hills rally

**BY:** Joe Bartels
**POSTED:** 10:43 PM, Mar 19, 2016
**UPDATED:** 5:49 PM, Mar 21, 2016
TAG: fountain hills | northeast valley

FOUNTAIN HILLS, AZ - Three protesters were arrested after clogging up a major artery leading to Republican presidential candidate Donald Trump's rally in Fountain Hills on Saturday.

Dozens of protesters trying to stop the Trump rally caused a very dangerous traffic jam, according to the Maricopa County Sheriff's Office.

Puente Arizona, a self-proclaimed human rights group, sent ABC15 video from the center of the protest.

Of those protesting, Michael Cassidy, Jacinta Gonzalez and Stephany Laughlin were arrested.

Gonzalez said because of her last name she was questioned by U.S. Immigration and Customs Enforcement agents after she was processed by MCSO. She said she was transferred to the custody of immigration agents after there was a "hold" placed on her.

MCSO said all three individuals went through an ICE interview, which is standard protocol. They said a hold was placed on Gonzalez for an unknown reason. After MCSO attempted to release the woman from their custody, ICE was notified and investigated.

ICE sent the following statement to ABC15:

*"Ms. Gonzalez-Goodman was recently released from U.S. Immigration and Customs Enforcement (ICE) custody after database checks determined she currently holds a valid United States passport. Under current ICE procedures, all foreign-born individuals who are booked into the Maricopa County Jail are interviewed by ICE personnel to determine alienage and removability and whether they would be an enforcement priority for the agency."*

Dozens of protesters were clogging Shea Boulevard at two different locations on either side of Fountain Hills.

At the same time, hundreds of cars were flooding into the area for the Donald Trump rally.

"That's the way to make your voice heard, to do something like this," said Brianda Martinez, who supported the protesters.

Case 2:16-cv-04388-JJT-MHB   Document 1-1   Filed 12/14/16   Page 66 of 110

Protesters did get the attention of law enforcement and national news media. The drama played out on live TV.

Air15 caught a Jeep driving through protesters, some even climbing onto the hood of the SUV.

In a protest against the violence and anti-immigrant views promoted by Donald Trump, a multiracial coalition of immigrant rights, faith, labor and local activists peacefully rallied as well as shut down both of the main roads leading to the event to stand #UnitedAgainstHate.

They point to the Trump effect as cause for a package of anti-immigrant laws being proposed in Arizona's statehouse – including those sponsored by the husband of Linda Kavanagh, the Mayor of Fountain Hills where the Trump rally was planned.

"In Arizona we've heard Trump's hate before and we know where it gets us," said Carlos Garcia, Executive Director of Puente Arizona in reference to the 2010 SB1070 that cost the state $200 million after a boycott and caused international embarrassment as the state became synonymous with racism. "The Trump effect isn't just about a candidate. Trump's ugly rhetoric is being turned into policy proposals as we speak that threaten the wholeness of our families and the safety of our communities. All people of conscience have to unite to stop it."

"People will not sit quietly as Trump campaigns to move us back in the shadows, to the back of the bus, or back in the closet," adds Marisa Franco, director of Mijente, a national hub for Latino organizing involved in the protest today. "The greatest act of love we can show is to shut down hate where it rears its head and demand that we do better than the cheap politics and false solutions that Trump is peddling. The billionaire may want to pit poor people against each other but our necks are not available for standing on."

 **Puente Arizona**
@PuenteAZ     [ Follow ]

Statement from AZ #StopTrump Protesters #UnitedAgainstHate: mijente.net/2016/03/19/sta…

4:02 PM - 19 Mar 2016

    129     88

The goal, they say, was to cause chaos.

"They came over here, trying to protest Donald Trump and the rally, trying to do the same thing in Chicago, try to shut down the rally and that's what they're trying to do," added Martinez.

Sheriff's deputies called in a tow truck to haul away the vehicles that were parked in the middle of the road.

 **Puente Arizona**
@PuenteAZ     [ Follow ]

Protesters chanting Trump the Hate as they confront racism at Trump rally #UnitedAgainstHate #StopTrump

2:13 PM - 19 Mar 2016

    181     167

"No, I am not surprised, we expected it," said Donald Trump supporter Jo Puma.

Case 2:16-cv-04388-JJT-MHB Document 1-1 Filed 12/14/16 Page 67 of 110

"We are not going to stop, it's not gonna make us give up," added Puma.

Law enforcement officials locked down the area, forcing many Trump supporters to walk to the event including an injured Marine who was on crutches, and tied up traffic for miles.

Copyright 2015 Scripps Media, Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Want more savings? See ALL ads this week

# EXHIBIT H

**U.S. Department of Justice**

# GUIDANCE FOR FEDERAL LAW ENFORCEMENT AGENCIES REGARDING THE USE OF RACE, ETHNICITY, GENDER, NATIONAL ORIGIN, RELIGION, SEXUAL ORIENTATION, OR GENDER IDENTITY



December 2014

## INTRODUCTION AND EXECUTIVE SUMMARY

This Guidance supersedes the Department of Justice's 2003 Guidance Regarding the Use of Race by Federal Law Enforcement Agencies. It builds upon and expands the framework of the 2003 Guidance, and it reaffirms the Federal government's deep commitment to ensuring that its law enforcement agencies conduct their activities in an unbiased manner. Biased practices, as the Federal government has long recognized, are unfair, promote mistrust of law enforcement, and perpetuate negative and harmful stereotypes. Moreover—and vitally important—biased practices are ineffective. As Attorney General Eric Holder has stated, such practices are "simply not good law enforcement."

Law enforcement practices free from inappropriate considerations, by contrast, strengthen trust in law enforcement agencies and foster collaborative efforts between law enforcement and communities to fight crime and keep the Nation safe. In other words, fair law enforcement practices are smart and effective law enforcement practices.

Even-handed law enforcement is therefore central to the integrity, legitimacy, and efficacy of all Federal law enforcement activities. The highest standards can—and should—be met across all such activities. Doing so will not hinder—and, indeed, will bolster—the performance of Federal law enforcement agencies' core responsibilities.

This new Guidance applies to Federal law enforcement officers performing Federal law enforcement activities, including those related to national security and intelligence, and defines not only the circumstances in which Federal law enforcement officers may take into account a person's race and ethnicity—as the 2003 Guidance did—but also when gender, national origin, religion, sexual orientation, or gender identity may be taken into account. This new Guidance also applies to state and local law enforcement officers while participating in Federal law enforcement task forces. Finally, this Guidance promotes training and accountability, to ensure that its contents are understood and implemented appropriately.

Biased law enforcement practices, as the 2003 Guidance recognized with regard to racial profiling, have a terrible cost, not only for individuals but also for the Nation as a whole. This new Guidance reflects the Federal government's ongoing commitment to keeping the Nation safe while upholding our dedication to the ideal of equal justice under the law.

Two standards in combination should guide use by Federal law enforcement officers of race, ethnicity, gender, national origin, religion, sexual orientation, or gender identity in law enforcement or intelligence activities:

- In making routine or spontaneous law enforcement decisions, such as ordinary traffic stops, Federal law enforcement officers may not use race, ethnicity, gender, national origin, religion, sexual orientation, or gender identity to any degree, except that officers may rely on the listed characteristics in a specific suspect description. This prohibition applies even where the use of a listed characteristic might otherwise be lawful.

- In conducting all activities other than routine or spontaneous law enforcement activities, Federal law enforcement officers may consider race, ethnicity, gender, national origin, religion, sexual orientation, or gender identity only to the extent that there is trustworthy information, relevant to the locality or time frame, that links persons possessing a particular listed characteristic to an identified criminal incident, scheme, or organization, a threat to national or homeland security, a violation of Federal immigration law, or an authorized intelligence activity. In order to rely on a listed characteristic, law enforcement officers must also reasonably believe that the law enforcement, security, or intelligence activity to be undertaken is merited under the totality of the circumstances, such as any temporal exigency and the nature of any potential harm to be averted. This standard applies even where the use of a listed characteristic might otherwise be lawful.

## DISCUSSION

The Constitution protects individuals against the invidious use of irrelevant individual characteristics. *See Whren v. United States*, 517 U.S. 806, 813 (1996). Such characteristics should never be the sole basis for a law enforcement action. This Guidance sets out requirements beyond the Constitutional minimum that shall apply to the use of race, ethnicity, gender, national origin,[1] religion, sexual orientation, and gender identity by Federal law enforcement officers.[2] This Guidance applies to such officers at all times, including when they are operating in partnership with non-Federal law enforcement agencies.

## I. GUIDANCE FOR FEDERAL LAW ENFORCEMENT OFFICERS

### A. Routine or Spontaneous Activities in Domestic Law Enforcement

**In making routine or spontaneous law enforcement decisions, such as ordinary traffic stops, Federal law enforcement officers may not use race, ethnicity, gender, national origin, religion, sexual orientation, or gender identity to any degree, except that officers may rely on the listed characteristics in a specific suspect description. This prohibition applies even where the use of a listed characteristic might otherwise be lawful.**

---

[1] As used in this Guidance, "national origin" refers to an individual's, or his or her ancestor's, country of birth or origin, or an individual's possession of the physical, cultural or linguistic characteristics commonly associated with a particular country. It does not refer to an individual's "nationality" (*i.e.*, country of citizenship or country of which the person is deemed a national), which may be relevant to the administration and enforcement of certain statutes, regulations, and executive orders.

[2] This Guidance is intended only to improve the internal management of the executive branch. It is not intended to, and does not, create any right, benefit, trust, or responsibility, whether substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities, entities, officers, employees, or agents, or any person, nor does it create any right of review in an administrative, judicial, or any other proceeding. This Guidance does not apply to Federal non-law enforcement personnel, including U.S. military, intelligence, or diplomatic personnel, and their activities. In addition, this Guidance does not apply to interdiction activities in the vicinity of the border, or to protective, inspection, or screening activities. All such activities must be conducted consistent with the Constitution and applicable Federal law and policy, in a manner that respects privacy, civil rights and civil liberties, and subject to appropriate oversight.

Law enforcement agencies and officers sometimes engage in law enforcement activities, such as traffic and foot patrols, that generally do not involve either the ongoing investigation of specific criminal activities or the prevention of catastrophic events or harm to national or homeland security. Rather, their activities are typified by spontaneous action in response to the activities of individuals whom they happen to encounter in the course of their patrols and about whom they have no information other than their observations. These general enforcement responsibilities should be carried out without *any* consideration of race, ethnicity, gender, national origin, religion, sexual orientation, or gender identity.

- ***Example***: While parked by the side of the George Washington Parkway, a Park Police Officer notices that nearly all vehicles on the road are exceeding the posted speed limit. Although each such vehicle is committing an infraction that would legally justify a stop, the officer may not use a listed characteristic as a factor in deciding which motorists to pull over. Likewise, the officer may not use a listed characteristic in deciding which detained motorists to ask to consent to a search of their vehicles.

Some have argued that overall discrepancies in certain crime rates among certain groups could justify using a listed characteristic as a factor in general traffic enforcement activities and would produce a greater number of arrests for non-traffic offenses (*e.g.*, narcotics trafficking). We emphatically reject this view. Profiling by law enforcement based on a listed characteristic is morally wrong and inconsistent with our core values and principles of fairness and justice. Even if there were overall statistical evidence of differential rates of commission of certain offenses among individuals possessing particular characteristics, the affirmative use of such generalized notions by law enforcement officers in routine, spontaneous law enforcement activities is tantamount to stereotyping. It casts a pall of suspicion over every member of certain groups without regard to the specific circumstances of a particular law enforcement activity, and it offends the dignity of the individual improperly targeted. Whatever the motivation, it is patently unacceptable and thus prohibited under this Guidance for law enforcement officers to act on the belief that possession of a listed characteristic signals a higher risk of criminality. This is the core of invidious profiling, and it must not occur.

The situation is different when an officer has specific information, based on trustworthy sources, to "be on the lookout" for specific individuals identified at least in part by a specific listed characteristic. In such circumstances, the officer is not acting based on a generalized assumption about individuals possessing certain characteristics; rather, the officer is helping locate specific individuals previously identified as involved in crime.

- ***Example***: While parked by the side of the George Washington Parkway, a Park Police Officer receives an "All Points Bulletin" to be on the lookout for a fleeing bank robbery suspect, a man of a particular race and particular hair color in his 30s driving a blue automobile. The officer may use this description, including the race and gender of the particular suspect, in deciding which speeding motorists to pull over.

3

### B. All Activities Other Than Routine or Spontaneous Law Enforcement Activities

**In conducting all activities other than routine or spontaneous law enforcement activities, Federal law enforcement officers may consider race, ethnicity, gender, national origin, religion, sexual orientation, or gender identity only to the extent that there is trustworthy information, relevant to the locality or time frame, that links persons possessing a particular listed characteristic to an identified criminal incident, scheme, or organization, a threat to national or homeland security, a violation of Federal immigration law, or an authorized intelligence activity. In order to rely on a listed characteristic, law enforcement officers must also reasonably believe that the law enforcement, security, or intelligence activity to be undertaken is merited under the totality of the circumstances, such as any temporal exigency and the nature of any potential harm to be averted. This standard applies even where the use of a listed characteristic might otherwise be lawful.[3]**

As noted above, there are circumstances in which law enforcement officers engaged in activities relating to particular identified criminal incidents, schemes, organizations, threats to national or homeland security, violations of Federal immigration law, or authorized intelligence activities may consider personal identifying characteristics of potential suspects, including race, ethnicity, gender, national origin, religion, sexual orientation, or gender identity. Common sense dictates that when a victim describes the assailant as possessing a certain characteristic, law enforcement officers may properly limit their search for suspects to persons possessing that characteristic. Similarly, in conducting activities directed at a specific criminal organization or terrorist group whose membership has been identified as overwhelmingly possessing a listed characteristic, law enforcement should not be expected to disregard such facts in taking investigative or preventive steps aimed at the organization's activities.

Reliance upon generalized stereotypes involving the listed characteristics is absolutely forbidden. In order for law enforcement officers to rely on information about a listed characteristic, the following must be true:

- The information must be relevant to the locality or time frame of the criminal activity, threat to national or homeland security, violation of Federal immigration law, or authorized intelligence activity;
- The information must be trustworthy; and
- The information concerning identifying listed characteristics must be tied to a particular criminal incident, a particular criminal scheme, a particular criminal organization, a threat to national or homeland security, a violation of Federal immigration law, or an authorized intelligence activity.

---

[3] This Guidance does not prohibit the accommodation of religious beliefs and practices consistent with the U.S. Constitution and federal law. The Guidance also does not prohibit officials from considering gender when "the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated." *Rostker v. Goldberg*, 453 U.S. 57, 79 (1981).

4

Because law enforcement and intelligence actions are necessarily context-specific, in applying each of these factors, law enforcement officers may properly account for relevant facts and circumstances, such as any temporal exigency and the nature of any potential harm to be averted. However, in all cases, law enforcement officers must reasonably believe that the law enforcement or intelligence activity to be undertaken is merited under the totality of the circumstances.

The following policy statements more fully explain these principles.

1. ***Law Enforcement Officers May Never Rely on Generalized Stereotypes, But May Rely Only on Specific Characteristic-Based Information***

This standard categorically bars the use of generalized assumptions based on listed characteristics.

- ***Example***: In the course of investigating an auto theft ring in a Federal park, law enforcement officers could not properly choose to target individuals of a particular national origin as suspects, based on a generalized assumption that those individuals are more likely to commit crimes.

This bar extends to the use of pretexts as an excuse to target minorities. Officers may not use such pretexts. This prohibition extends to the use of other, facially neutral factors as a proxy for overtly targeting persons because of a listed characteristic. This concern arises most frequently when aggressive law enforcement efforts are focused on "high crime areas." The issue is ultimately one of motivation and evidence; certain seemingly characteristic-based efforts, if properly supported by reliable, empirical data, are in fact neutral.

- ***Example***: In connection with a new initiative to increase drug arrests, law enforcement officers begin aggressively enforcing speeding, traffic, and other public area laws in a neighborhood predominantly occupied by people of a single race. The choice of neighborhood was not based on the number of 911 calls, number of arrests, or other pertinent reporting data specific to that area, but only on the general assumption that more drug-related crime occurs in that neighborhood because of its racial composition. This effort would be improper because it is based on generalized stereotypes.

- ***Example***: Law enforcement officers seeking to increase drug arrests use tracking software to plot out where, if anywhere, drug arrests are concentrated in a particular city, and discover that the clear majority of drug arrests occur in particular precincts that happen to be neighborhoods predominantly occupied by people of a single race. So long as they are not motivated by racial animus, officers can properly decide to enforce all laws aggressively in that area, including less serious quality of life ordinances, as a means of increasing drug-related arrests. *See, e.g., United States v Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) ("We must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go

about their daily business, but is limited to specific, circumscribed locations where particular crimes occur with unusual regularity.").

By contrast, where law enforcement officers are investigating a crime and have received *specific information* that the suspect possesses a certain listed characteristic (*e.g.*, direct observations by the victim or other witnesses), the officers may reasonably use that information, even if it is the only descriptive information available. In such an instance, it is the victim or other witness making the classification, and officers may use reliable incident-specific identifying information to apprehend criminal suspects. Officers, however, must use caution in the rare instance in which a suspect's possession of a listed characteristic is the only available information. Although the use of that information may not be unconstitutional, broad targeting of discrete groups always raises serious fairness concerns.

- ***Example***: The victim of an assault describes her assailant as an older male of a particular race with a birthmark on his face. The investigation focuses on whether any men in the surrounding area fit the victim's description. Here investigators are properly relying on a description given by the victim, which included the assailant's race and gender, along with his age and identifying personal characteristic. Although the ensuing investigation affects individuals of a particular race and gender, that investigation is not undertaken with a discriminatory purpose. Thus use of race and gender as factors in the investigation, in this instance, is permissible.

## 2.  *The Information Must be Relevant to the Locality or Time Frame*

Any information that law enforcement officers rely upon concerning a listed characteristic possessed by persons who may be linked to specific criminal activities, a threat to national or homeland security, a violation of Federal immigration law, or an authorized intelligence activity must be locally or temporally relevant.

- ***Example***: Five years ago, DEA issued an intelligence report that indicated that a drug ring whose members are known to be predominantly of a particular ethnicity is trafficking drugs in Charleston, SC. An agent operating in Los Angeles reads this intelligence report. In the absence of information establishing that this intelligence is also applicable in Southern California or at the present time, the agent may not use ethnicity as a factor in making local law enforcement decisions about individuals who are of the particular ethnicity that was predominant in the Charleston drug ring.

## 3.  *The Information Must be Trustworthy*

Where the information relied upon by law enforcement officers linking a person possessing a listed characteristic to potential criminal activity, a threat to national or homeland security, a violation of Federal immigration law, or an authorized intelligence activity is unreliable or is too generalized and unspecific, reliance on that characteristic is prohibited.

- ***Example***: ATF special agents receive an uncorroborated anonymous tip that a male of a particular ethnicity will purchase an illegal firearm at a Greyhound bus terminal

6

in an ethnically diverse North Philadelphia neighborhood.  Although agents surveilling the location are free to monitor the movements of whomever they choose, the agents are prohibited from using the tip information, without more, to target any males of that ethnicity in the bus terminal.  *Cf. Morgan v. Woessner*, 997 F.2d 1244, 1254 (9th Cir. 1993) (finding no reasonable basis for suspicion where tip "made all black men suspect").  The information is neither sufficiently reliable nor sufficiently specific.

In determining whether information is trustworthy, an officer should consider the totality of the circumstances, such as the reliability of the source, the specificity of the information, and the context in which it is being used.

- *Example*: ICE receives an uncorroborated anonymous tip indicating that females from a specific Eastern European country have been smuggled into Colorado and are working at bars in a certain town.  Agents identify a group of women wearing t-shirts with the logo of a local bar who seem to be speaking an Eastern European language.  The agents approach the group to ask them questions about their immigration status.  Because the women match the specific information provided by the tipster, the information is sufficient under the circumstances to justify the agents' actions.

    4. ***Characteristic-Based Information Must Always be Specific to Particular Suspects or Incidents; Ongoing Criminal Activities, Schemes, or Enterprises; a Threat to National or Homeland Security; a Violation of Federal Immigration Law, or an Authorized Intelligence Activity***

These standards contemplate the appropriate use of both "suspect-specific" and "incident-specific" information.  As noted above, where a crime has occurred and law enforcement officers have eyewitness accounts including the race, ethnicity, gender, national origin, religion, sexual orientation, or gender identity of the perpetrator, that information may be used.  Law enforcement officers may also use reliable, locally or temporally relevant information linking persons possessing a listed characteristic to a particular incident, unlawful scheme, or ongoing criminal enterprise, a threat to national or homeland security, a violation of Federal immigration law, or an authorized intelligence activity—even absent a description of any particular individual suspect.  In certain cases, the circumstances surrounding an incident, ongoing criminal activity, threat to national or homeland security, or violation of Federal immigration law will point strongly to a perpetrator possessing a specific listed characteristic, even though law enforcement officers lack an eyewitness account.

- *Example*: The FBI is investigating the murder of a known gang member and has information that the shooter is a member of a rival gang.  The FBI knows that the members of the rival gang are exclusively members of a certain ethnicity.  This information, however, is not suspect-specific because there is no description of the particular assailant.  But because law enforcement officers have reliable, locally or temporally relevant information linking a rival group with a distinctive ethnic character to the murder, the FBI could properly consider ethnicity in conjunction with other appropriate factors in the course of conducting their investigation.  Agents

7

could properly decide to focus on persons dressed in a manner consistent with gang activity, but ignore persons dressed in that manner who do not appear to be members of that particular ethnicity.

- *Example:* Local law enforcement arrests an individual, and in the course of custodial interrogation the individual states that he was born in a foreign country and provides other information that reasonably leads local law enforcement to question his immigration status. Criminal background checks performed by the local law enforcement agency reveal that the individual was recently released from state prison after completing a lengthy sentence for aggravated sexual assault. Local law enforcement contacts ICE to inquire as to the individual's immigration status. When ICE's database check on the immigration status of the arrestee does not locate a record of the individual's lawful immigration status, ICE sends an officer to the jail to question the individual about his immigration status, whereupon the individual states that he entered the United States without authorization and has never regularized his status. ICE assumes custody of the individual and processes him for removal from the United States. ICE properly relied on the facts presented to it, including that the arrestee was born in a foreign country, in searching its immigration database and conducting its subsequent investigation.

In addition, law enforcement officers may use a listed characteristic in connection with source recruitment, where such characteristic bears on the potential source's placement and access to information relevant to an identified criminal incident, scheme, or organization, a threat to national or homeland security, a violation of Federal immigration law, or an authorized intelligence activity.

- *Example*: A terrorist organization that is made up of members of a particular ethnicity sets off a bomb in a foreign country. There is no specific information that the organization is currently a threat to the United States. To gain intelligence on the evolving threat posed by the organization, and to gain insight into its intentions regarding the U.S. homeland and U.S. interests, the FBI may properly consider ethnicity when developing sources with information that could assist the FBI in mitigating any potential threat from the organization.

### 5. *Reasonably Merited Under the Totality of the Circumstances*

Finally, when a law enforcement officer relies on a listed characteristic in undertaking an action, that officer must have a reasonable belief that the action is merited under the totality of the circumstances. This standard ensures that, under the circumstances, the officer is acting in good faith when he or she relies in part on a listed characteristic to take action.

- *Example*: A law enforcement officer who is working as part of a federal task force has received a reliable tip that an individual intends to detonate a homemade bomb in a train station during rush hour, but the tip does not provide any more information. The officer harbors stereotypical views about religion and therefore decides that investigators should focus on individuals of a particular faith. Doing so would be

8

impermissible because a law enforcement officer's stereotypical beliefs never provide a reasonable basis to undertake a law enforcement or intelligence action.

Note that these standards allow the use of reliable identifying information about planned future crimes, attacks, or other violations of Federal law. Where officers receive a credible tip from a reliable informant regarding a planned crime or attack that has not yet occurred, the officers may use this information under the same restrictions applying to information obtained regarding a past incident. A prohibition on the use of reliable prospective information would severely hamper law enforcement efforts by essentially compelling law enforcement officers to wait for incidents to occur, instead of taking pro-active measures to prevent them from happening.

- ***Example***: While investigating a specific drug trafficking operation, DEA special agents learn that a particular methamphetamine distribution ring is manufacturing the drug in California, and plans to have couriers pick up shipments at the Sacramento, California, airport and drive the drugs back to Oklahoma for distribution. The agents also receive trustworthy information that the distribution ring has specifically chosen to hire older women of a particular race to act as the couriers. DEA agents may properly target older women of that particular race driving vehicles with indicia such as Oklahoma plates near the Sacramento airport.

### 6. *National and Homeland Security and Intelligence Activities*

Since the terrorist attacks on September 11, 2001, Federal law enforcement agencies have used every legitimate tool to prevent future attacks and deter those who would cause devastating harm to our Nation and its people through the use of biological or chemical weapons, other weapons of mass destruction, suicide hijackings, or any other means. "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Secretary of State*, 378 U.S. 500, 509 (1964)).

The years since September 11 have also demonstrated that Federal law enforcement officers can achieve this critical goal without compromising our cherished value of equal justice under the law. Every day, Federal law enforcement officers work to keep our Nation safe, and they do so without invidious profiling. The standard embodied in this Guidance thus applies to Federal law enforcement agencies' national and homeland security operations, which will continue to focus on protecting the public while upholding our values.

National security, homeland security, and intelligence activities often are national in scope and focused on prevention of attacks by both known and unknown actors, not just prosecution. For example, terrorist organizations might aim to engage in acts of catastrophic violence in any part of the country (indeed, in multiple places simultaneously, if possible). These facts do not change the applicability of the Guidance, however. In order to undertake an action based on a listed characteristic, a law enforcement officer must have trustworthy information, relevant to the locality or time frame, linking persons possessing that characteristic

9

to a threat to national security, homeland security, or intelligence activity, and the actions to be taken must be reasonable under the totality of the circumstances.

- *Example*: The FBI receives reliable information that persons affiliated with a foreign ethnic insurgent group intend to use suicide bombers to assassinate that country's president and his entire entourage during an official visit to the United States. Agents may appropriately focus investigative attention on identifying members of that ethnic insurgent group who may be present and active in the United States and who, based on other available information, might be involved in planning some such attack during the state visit.

- *Example*: A citizen of Country A, who was born in Country B, lawfully entered the United States on an F-1 student visa. The school that the individual was supposed to attend notifies ICE that he failed to register or attend the school once in the United States, in violation of the terms of his visa. ICE has intelligence that links individuals with ties to Country B who have registered at that school to a designated terrorist organization that has made statements about launching an attack against the United States. ICE selects the individual for investigation, identification, location, and arrest. Once taken into custody, the individual is questioned and a decision is made to place him in removal proceedings and to detain him during those proceedings. ICE's decision to prioritize this immigration status violator for investigation and arrest was proper because it was based upon a combination of the factors known about the individual, including his national origin, school affiliation, and behavior upon arrival in the United States.

Good law enforcement work also requires that officers take steps to know their surroundings even before there is a specific threat to national security. Getting to know a community and its features can be critical to building partnerships and facilitating dialogues, which can be good for communities and law enforcement alike. Law enforcement officers may not, however, target only those persons or communities possessing a specific listed characteristic without satisfying the requirements of this Guidance.

- *Example*: An FBI field office attempts to map out the features of the city within its area of responsibility in order to gain a better understanding of potential liaison contacts and outreach opportunities. In doing so, the office acquires information from public sources regarding population demographics, including concentrations of ethnic groups. This activity is permissible if it is undertaken pursuant to an authorized intelligence or investigative purpose. The activity would not be permitted without such an authorized purpose or in circumstances that do not otherwise meet the requirements of this Guidance.

## ADDITIONAL REQUIREMENTS

In order to ensure its implementation, this Guidance finally requires that Federal law enforcement agencies take the following steps on training, data collection, and accountability.

10

**Training**

Training provides agents and officers with an opportunity to dedicate their attention to a task, to learn about the factual application of theoretical concepts, and to learn from their colleagues. Training also provides an opportunity to ensure that consistent practices are applied across the agency.

Law enforcement agencies therefore must administer training on this Guidance to all agents on a regular basis, including at the beginning of each agent's tenure. Training should address both the legal authorities that govern this area and the application of this Guidance. Training will be reviewed and cleared by agency leadership to ensure consistency through the agency.

**Data Collection**

Data collection can be a tremendously powerful tool to help managers assess the relative success or failure of policies and practices. At the same time, data collection is only useful to the extent that the collected data can be analyzed effectively and that conclusions can be drawn with confidence.

Each law enforcement agency therefore (i) will begin tracking complaints made based on the Guidance, and (ii) will study the implementation of this Guidance through targeted, data-driven research projects.

**Accountability**

Accountability is essential to the integrity of Federal law enforcement agencies and their relationship with the citizens and communities they are sworn to protect. Therefore, all allegations of violations of this Guidance will be treated just like other allegations of misconduct and referred to the appropriate Department office that handles such allegations. Moreover, all violations will be brought to the attention of the head of the Department of which the law enforcement agency is a component.

# EXHIBIT I

# The Foreign-Born Population in the United States: 2010

*American Community Survey Reports*

Issued May 2012

ACS-19

By
Elizabeth M. Grieco,
Yesenia D. Acosta,
G. Patricia de la Cruz,
Christine Gambino,
Thomas Gryn,
Luke J. Larsen,
Edward N. Trevelyan,
and
Nathan P. Walters

## INTRODUCTION

This report presents a portrait of the foreign-born population in the United States. The U.S. Census Bureau uses the term *foreign born* to refer to anyone who is not a U.S. citizen at birth. This includes naturalized citizens, lawful permanent residents, temporary migrants (such as foreign students), humanitarian migrants (such as refugees), and undocumented migrants. The term *native born* refers to anyone born in the United States, Puerto Rico, or a U.S. Island Area, or those born abroad of at least one U.S. citizen parent.[1]

Information on the demographic, social, economic, and housing characteristics presented in this report is based on data from the 2010 American Community Survey (ACS).[2]

In this report, data on the foreign born are presented by broad region of birth, including Africa, Asia, Europe, Latin America and the Caribbean, Northern America, and Oceania. More detail is shown for Latin America and the Caribbean—including Mexico, Other Central America, South America, and the Caribbean. For this report, the category Other Central America excludes Mexico but includes the remaining countries of Central America.[3] In the graphs displaying information by nativity and place of birth, data on the total, native, and foreign-born populations as well as the regions of birth are shown in light green, while the areas within Latin America are shown in light blue.[4]

Data are shown for population (e.g., age, marital status, occupation) and household (e.g., size, type, income) characteristics. A household is a person or a group of people who occupy a housing unit as their current residence. College residence halls, military barracks, correctional facilities, and other group quarters are not included. A householder is usually the person, or one of the people, in whose name the home is owned, being bought, or rented. A family household consists of a householder and one or more people living together in the same household who are related to the householder by birth, marriage, or adoption. It may also include people unrelated to the householder. The nativity status and place of birth of a household are determined by the nativity status and place of birth of the householder. A household with a foreign-born householder may also contain native residents, and a household with a native householder may also contain foreign-born residents.

The 2010 ACS estimated the number of foreign born in the United States to be

---

[1] The terms *native* and *native born* are used interchangeably in this report. U.S. Island Areas include Guam, American Samoa, the U.S. Virgin Islands, and the Commonwealth of the Northern Mariana Islands.

[2] Additional information about the ACS is available on the Census Bureau's Web site at *www.census.gov/acs/www/*.

[3] Other Central America includes the countries of Belize, Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua, and Panama.

[4] The term *Latin America and the Caribbean* includes countries in Central and South America and the Caribbean. Throughout the remainder of this report, the term *Latin America* is used to refer to all of these areas. A complete list of the countries included in the regions and subregions is available on the Census Bureau's Web site at *www.census.gov /acs/www/Downloads/data_documentation /CodeLists/Foreign_Country_Code_List_062310.pdf*.



U.S. Department of Commerce
Economics and Statistics Administration
U.S. CENSUS BUREAU

Table 1.
## Population by Nativity Status and Citizenship: 2010
(Numbers in thousands. Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see *www.census.gov /acs/www/*)

| Nativity and citizenship | Population[1] | Margin of error[2] (±) | Percent | Margin of error[2] (±) |
|---|---|---|---|---|
| Total | 309,350 | (X) | 100.0 | (X) |
| Native | 269,394 | 115 | 87.1 | – |
| Foreign born | 39,956 | 115 | 12.9 | – |
| Naturalized citizen | 17,476 | 82 | 5.6 | – |
| Noncitizen | 22,480 | 120 | 7.3 | – |

(X) Not applicable.
– Represents or rounds to zero.
[1] Population as of July 1, 2010.
[2] Data are based on a sample and are subject to sampling variability. A margin of error is a measure of an estimate's variability. The larger the margin of error in relation to the size of the estimates, the less reliable the estimate. When added to and subtracted from the estimate, the margin of error forms the 90 percent confidence interval.
Source: U.S. Census Bureau, American Community Survey, 2010.

Table 2.
## Foreign-Born Population by Region of Birth: 2010
(Numbers in thousands. Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see *www.census.gov /acs/www/*)

| Region of birth | Population | Margin of error[1] (±) | Percent | Margin of error[1] (±) |
|---|---|---|---|---|
| Total[2] | 39,956 | 115 | 100.0 | (X) |
| Africa | 1,607 | 33 | 4.0 | 0.1 |
| Asia | 11,284 | 47 | 28.2 | 0.1 |
| Europe | 4,817 | 44 | 12.1 | 0.1 |
| Latin America and the Caribbean | 21,224 | 90 | 53.1 | 0.1 |
| Mexico | 11,711 | 83 | 29.3 | 0.2 |
| Other Central America | 3,053 | 46 | 7.6 | 0.1 |
| South America | 2,730 | 42 | 6.8 | 0.1 |
| Caribbean | 3,731 | 42 | 9.3 | 0.1 |
| Northern America | 807 | 16 | 2.0 | – |
| Oceania | 217 | 10 | 0.5 | – |

(X) Not applicable.
– Represents or rounds to zero.
[1] Data are based on a sample and are subject to sampling variability. A margin of error is a measure of an estimate's variability. The larger the margin of error in relation to the size of the estimates, the less reliable the estimate. When added to and subtracted from the estimate, the margin of error forms the 90 percent confidence interval.
[2] Excludes 181 persons who reported they were born at sea.
Note: Percentages do not sum to 100.0 due to rounding.
Source: U.S. Census Bureau, American Community Survey, 2010.

nearly 40 million, or 13 percent of the total population (Table 1).[5]

The foreign-born population from Latin America was the largest region-of-birth group, accounting for over half (53 percent) of all foreign born (Table 2). By comparison, 28 percent of the foreign born were born in Asia, 12 percent in Europe, 4 percent in Africa, 2 percent in Northern America, and less than 1 percent in Oceania.[6] Among the 21.2 million foreign born from Latin America, 11.7 million, or over half (55 percent), were born in Mexico. Of the total foreign-born population, 29 percent were born in Mexico.

[5] This report discusses data about residents of the United States, including the 50 states and the District of Columbia; it does not include data about residents of Puerto Rico. Population totals shown in this report are as of July 1, 2010.
[6] The majority of the foreign born from Northern America were from Canada (99 percent). About two-thirds of the foreign born from Oceania were from Australia and New Zealand (48 percent) and Fiji (18 percent).

## SUMMARY HIGHLIGHTS

### Geographic Distribution

While the foreign born resided in every state in 2010, over half lived in just four states: California, New York, Texas, and Florida. Over one-fourth of the total foreign-born population lived in California. California, New York, and New Jersey had the highest foreign-born proportions in their total populations. Over 1 in 4 residents of California and over 1 in 5 residents of New York and New Jersey were foreign born.

### Age, Marital Status, Fertility, and Household Size and Type

Half of the foreign born were between the ages of 18 and 44, compared with about one-third of the native born. The foreign born were also more likely than natives to be married and less likely to be divorced. Foreign-born households were, on average, larger than native households and were more likely to be family households, to include children under 18, and to be multigenerational. Foreign-born women were more likely to have given birth in the last 12 months than native women.

### Year of Entry, Naturalization Rate, and English-Speaking Ability

Over half of the foreign born came to live in the United States since 1990, with about one-third entering the country in 2000 or later. Overall, about 2 in 5 foreign born were naturalized citizens. For those foreign born who entered before 1980, about 4 of 5 were naturalized citizens. About half of all foreign born either spoke only English at home or spoke a language other than English at home and spoke English "very well."

### Educational Attainment, Labor Force Participation, and Occupation

Compared with the native-born population, the foreign born were less likely to be high school graduates. However, over 2 in 3 foreign born were high school graduates and more than 1 in 4 aged 25 years and older attained at least a bachelor's degree. The foreign born were more likely than the native born to be in the labor force. Over one-fourth of the foreign born worked in management, business, science, and art occupations with an additional one-fourth working in service occupations.

### Household Income, Health Insurance Coverage, and Percent in Poverty

About two-thirds of the foreign born had some form of health insurance coverage and, of those, three-fourths were covered by a private insurer. The median income of foreign-born households was less than that of native households, and the foreign born were more likely than the native born to live in poverty.

**The foreign born represented 13 percent of the U.S. population. By state, the percentage of foreign born ranged from just over 1 percent in West Virginia to 27 percent in California.**

- The states with the highest percentage of foreign born in their populations were California (27 percent), New York (22 percent), and New Jersey (21 percent).

- In 14 states and the District of Columbia, the percentage of foreign born was equal to or greater than the national average of 13 percent. With the exception of Texas, Florida, and Illinois, these states were primarily in the western and northeastern parts of the country.

- With the exception of Illinois (14 percent), the percentage of foreign born in all states of the Midwest region was below 8 percent, including North Dakota and South Dakota, each with about 3 percent.[7]

- South Central states also tended to have relatively low proportions of foreign born in their populations. With the exception of Texas and Oklahoma, all states in this division had less than 5 percent foreign born.[8]

---

[7] The Midwest region includes the states of Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, and Wisconsin.

[8] The South Central Census division includes Alabama, Arkansas, Kentucky, Louisiana, Mississippi, Oklahoma, Tennessee, and Texas.



Figure 1.
**Foreign-Born Population as Percent of State Population: 2010**
(Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see *www.census.gov/acs/www/*)

Percent
- 20.0 or higher
- 15.0 to 19.9
- 10.0 to 14.9
- 5.0 to 9.9
- Less than 5.0

*U.S. percent: 12.9*

Source: U.S. Census Bureau, American Community Survey, 2010.

**One-fourth of the foreign-born population was concentrated in a single state, while over half was distributed among just four states.**

- In 2010, more than 1 in 4 foreign-born residents lived in California.

- New York, Texas, and Florida accounted for 30 percent of the foreign-born population. Including California, these four states were home to more than half of all foreign born.

- About 74 percent of all foreign born lived in 10 states. The remaining 26 percent was dispersed among 40 states and the District of Columbia, each with 2 percent or less of the foreign-born population.

- The four states with the largest proportions of the foreign-born population were also the four states with the largest proportions of the total population, regardless of nativity.[9]

_____

[9] In 2010, the states with the largest total populations included California (37.3 million), Texas (25.3 million), New York (19.4 million), and Florida (18.8 million). Together, their populations represented 33 percent of the total U.S. population.



Figure 2.
**Foreign-Born Population by State:  2010**
(Percent distribution. Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see *www.census.gov/acs/www/*)



All other states
26.0

California
25.4

New York
10.8

Texas
10.4

Florida 9.2
New Jersey 4.6
Illinois 4.4
Massachusetts 2.5
Georgia 2.4
Virginia 2.3
Washington 2.2

Note: Percentages do not sum to 100.0 due to rounding.
Source: U.S. Census Bureau, American Community Survey, 2010.

**Half of the foreign born were between the ages of 18 and 44, compared with about one-third of the native born.**

- Over 80 percent of the foreign-born population was between the ages of 18 to 64, including 50 percent between the ages of 18 to 44. Among the native born, 60 percent were between the ages of 18 to 64, including 35 percent between 18 and 44.

- The native population had a higher proportion under the age of 18 than the foreign-born population. About 27 percent of the native population was under age 18, compared with 7 percent of the foreign born. This difference reflects the fact that children of immigrants born in the United States are, by definition, native.

- Compared with the native born and foreign born from other regions, the proportion of people aged 65 and older was highest among those born in Europe. Over 28 percent of the population born in Europe was aged 65 and older.

- The foreign born had a median age of 41.4 years, about 5 years older than the median age of the native population,

35.9 years. The higher median age of the foreign-born population reflects the higher proportion of children in the native population than in the foreign-born population.

- Among the world regions of birth, the foreign-born population from Europe (51.7) and Northern America (51.3) had the highest median age, while those born in Africa (38.0) had the lowest median age.[10]

---

[10] The estimates for Europe and Northern America are not statistically different.



Figure 3.
**Selected Age Groups and Median Age: 2010**
(Percent distribution. Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see *www.census.gov/acs/www/*)

| | Under 18 | 18 to 44 | 45 to 64 | 65 and over | Median age (years) |
|---|---|---|---|---|---|
| Total | 24.0 | 36.5 | 26.4 | 13.1 | 37.2 |
| Native | 26.5 | 34.5 | 25.8 | 13.2 | 35.9 |
| Foreign born | 7.1 | 50.3 | 30.2 | 12.4 | 41.4 |
| Africa | 10.6 | 54.9 | 28.2 | 6.3 | 38.0 |
| Asia | 7.0 | 47.6 | 32.8 | 12.7 | 42.7 |
| Europe | 5.6 | 32.9 | 33.0 | 28.4 | 51.7 |
| Northern America | 7.3 | 30.7 | 36.1 | 25.9 | 51.3 |
| Oceania | 7.8 | 51.7 | 30.3 | 10.3 | 40.6 |
| Latin America | 7.2 | 56.1 | 28.1 | 8.6 | 39.1 |
| Mexico | 7.9 | 61.2 | 24.6 | 6.3 | 37.2 |
| Other Central America | 6.0 | 62.4 | 25.9 | 5.7 | 37.0 |
| South America | 7.2 | 48.8 | 33.7 | 10.3 | 42.2 |
| Caribbean | 5.8 | 40.2 | 36.7 | 17.2 | 46.7 |

Note: Some percentages do not sum to 100.0 due to rounding.
Source: U.S. Census Bureau, American Community Survey, 2010.

**The percent male for the native population was comparable to that of the foreign born, but there was some variation in sex composition by age and region-of-birth groups.**

- About 49 percent of both the native and foreign-born populations were male. However, for those aged 18 to 44, the foreign born had a slightly higher proportion of males (51 percent) than the native born (50 percent).

- Among the regions of birth, the foreign born from Africa had the highest proportion of males (53 percent), while the foreign born from Europe and Northern America had the lowest (each 45 percent).[11] Among areas within Latin America,

Mexico had the highest proportion of males (54 percent), while the Caribbean and South America had the lowest (each 46 percent).[12]

- For the population aged 18 to 44, the foreign born from Latin America had the highest proportion of males (54 percent), while the foreign born from Europe and Asia (each 47 percent) were among the lowest.[13] Among the areas within Latin America, Other Central America

had the highest proportion of males (57 percent), while South America and the Caribbean (each 47 percent) had the lowest.[14]

- For the population aged 45 to 64, the foreign born from Africa had the highest proportion of males (57 percent). Among the areas within Latin America, Mexico had the highest proportion of males (53 percent) while South America (45 percent) had the lowest.

[11] The estimates for Europe and Northern America are not statistically different.

[12] The estimates for the Caribbean and South America are not statistically different.

[13] The estimates for Europe and Asia are not statistically different from Northern America.

[14] The estimates for South America and the Caribbean are not statistically different.



Figure 4.
**Percent Male: 2010**
(Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see *www.census.gov/acs/www/*)

|  | All ages | 18 to 44 | 45 to 64 |
|---|---|---|---|
| Total | 49.2 | 50.3 | 48.7 |
| Native | 49.2 | 50.1 | 48.8 |
| Foreign born | 49.1 | 51.2 | 48.4 |
| Africa | 52.6 | 51.5 | 56.9 |
| Asia | 46.6 | 47.3 | 46.6 |
| Europe | 44.9 | 47.1 | 47.4 |
| Northern America | 45.3 | 48.2 | 46.4 |
| Oceania | 48.4 | 50.5 | 50.2 |
| Latin America | 51.2 | 53.6 | 49.3 |
| *Mexico* | *53.7* | *55.3* | *52.5* |
| *Other Central America* | *52.9* | *57.2* | *46.8* |
| *South America* | *46.0* | *47.3* | *45.3* |
| *Caribbean* | *45.9* | *46.8* | *46.5* |

Source: U.S. Census Bureau, American Community Survey, 2010.

**About three-fifths of the foreign born were married, compared with less than half of the native born.**

- In 2010, 58 percent of the foreign born aged 15 and older were married, while 26 percent were never married. By comparison, the native born aged 15 and older were less likely to be married (47 percent) and more likely to never have been married (33 percent). However, the native born were more likely to be separated or divorced (14 percent) than the foreign born (11 percent).

- Among the regions of birth, the foreign-born population from Asia had the highest proportion married (66 percent), while those born in Africa and Latin America (each 54 percent) had the lowest.

- Within Latin America, those born in Mexico were the most likely to be married (58 percent), while those born in the Caribbean were the most likely to be separated or divorced (18 percent). Among those born in Other Central America, about one-third (38 percent) were never married.



Figure 5.
**Marital Status: 2010**
(Percent distribution of population 15 and older. Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see www.census.gov/acs/www/)

| | Never married | Married | Separated | Divorced | Widowed |
|---|---|---|---|---|---|
| Total | 32.1 | 48.8 | 2.2 | 10.9 | 6.0 |
| Native | 33.2 | 47.0 | 2.1 | 11.5 | 6.2 |
| Foreign born | 25.8 | 58.5 | 3.1 | 7.5 | 5.1 |
| Africa | 29.7 | 54.0 | 4.0 | 8.5 | 3.7 |
| Asia | 21.8 | 66.0 | 1.5 | 5.7 | 5.1 |
| Europe | 16.4 | 61.5 | 1.6 | 9.7 | 10.8 |
| Northern America | 17.9 | 61.9 | 1.4 | 9.9 | 8.8 |
| Oceania | 22.5 | 63.5 | 2.1 | 6.6 | 5.4 |
| Latin America | 30.2 | 53.9 | 4.2 | 7.9 | 3.8 |
| Mexico | 29.6 | 57.7 | 3.9 | 5.5 | 3.2 |
| Other Central America | 38.3 | 47.3 | 4.2 | 7.3 | 2.9 |
| South America | 25.8 | 54.9 | 4.0 | 11.3 | 4.0 |
| Caribbean | 28.4 | 46.9 | 5.1 | 13.2 | 6.4 |

Note: Some percentages do not sum to 100.0 due to rounding.
Source: U.S. Census Bureau, American Community Survey, 2010.

**Foreign-born women were more likely to have given birth in the past 12 months than native women.**

- Foreign-born women had a higher fertility rate than native women.[15] About 70 of every 1,000 foreign-born women aged 15 to 50 had given birth in the 12 months prior to being surveyed, compared with about 52 of every 1,000 native women aged 15 to 50.

- Among the regions of birth, foreign-born women aged 15 to 50 from Africa had the highest fertility rate, with 97 of every 1,000 women having given birth in the 12 months prior to being surveyed.

- About 85 of every 1,000 foreign-born women aged 15 to 50 from Mexico had given birth during the 12 months prior to being surveyed.

- About 39 percent of native women who had given birth in the past 12 months were unmarried, compared with 25 percent of foreign-born women.

[15] Of every 1,000 women aged 15 to 50, the number who had given birth in the 12 months preceding the date of the survey, whether in 2009 or 2010.



Figure 6.
**Fertility: 2009–2010**
(Based on women aged 15 to 50 years. Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see *www.census.gov/acs/www/*)

| | Births per 1,000 women in the past 12 months | Percent of women with a birth in the past 12 months who were unmarried |
|---|---|---|
| Total | 54.6 | 36.0 |
| Native | 51.5 | 39.1 |
| Foreign born | 70.3 | 24.5 |
| Africa | 97.3 | 16.5 |
| Asia | 62.5 | 8.5 |
| Europe | 55.0 | 9.9 |
| Northern America | 57.3 | 7.9 |
| Oceania | 77.8 | 21.3 |
| Latin America | 75.0 | 34.4 |
| Mexico | 85.2 | 33.7 |
| Other Central America | 78.0 | 41.7 |
| South America | 56.9 | 23.4 |
| Caribbean | 51.0 | 38.7 |

Source: U.S. Census Bureau, American Community Survey, 2010.

**Over one-third of the foreign-born population came to live in the United States in 2000 or later.**

- About two-thirds (62 percent) of the foreign born came to live in the United States in 1990 or later, including over one-third (35 percent) who entered in 2000 or later.

- The majority (78 percent) of the foreign-born population from Africa entered in 1990 or later, including 52 percent who entered in 2000 or later. By comparison, over half of the foreign born from Northern America and Europe entered before 1990.

- About 2 of every 5 foreign born from South America (41 percent) and Other Central America (39 percent) entered the United States in 2000 or later.



Figure 7.
**Period of Entry: 2010**
(Percent distribution. Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see *www.census.gov/acs/www/*)

| | Before 1980 | 1980 to 1989 | 1990 to 1999 | 2000 or later |
|---|---|---|---|---|
| Foreign born | 19.6 | 18.6 | 27.2 | 34.7 |
| Africa | 9.1 | 12.9 | 26.5 | 51.5 |
| Asia | 16.5 | 20.7 | 26.6 | 36.2 |
| Europe | 39.5 | 11.7 | 24.6 | 24.2 |
| Northern America | 42.0 | 10.0 | 20.4 | 27.6 |
| Oceania | 19.1 | 15.7 | 24.3 | 40.9 |
| Latin America | 16.7 | 19.8 | 28.4 | 35.2 |
| Mexico | 16.0 | 18.8 | 30.7 | 34.5 |
| Other Central America | 10.7 | 23.3 | 26.6 | 39.4 |
| South America | 15.5 | 18.1 | 25.7 | 40.7 |
| Caribbean | 24.5 | 21.1 | 24.4 | 30.0 |

Note: Some percentages do not sum to 100.0 due to rounding.
Source: U.S. Census Bureau, American Community Survey, 2010.

**Over 2 of every 5 foreign born were naturalized citizens.**

- As of 2010, 44 percent of all foreign born were naturalized citizens.

- The foreign born from Europe (62 percent) and Asia (58 percent) had the highest percent naturalized of all region-of-birth groups.

- The foreign born from Latin America had the lowest percent naturalized (32 percent) of all regions of birth.

- Of those born in the Caribbean, over half (54 percent) were naturalized citizens. By comparison, 44 percent of

the foreign born from South America were naturalized citizens.

- About one-fourth of the foreign born from Mexico were naturalized citizens.



Figure 8.
**Percent Naturalized: 2010**
(Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see *www.census.gov/acs/www/*)

| Category | Percent |
|---|---|
| Foreign born | 43.7 |
| Africa | 46.1 |
| Asia | 57.7 |
| Europe | 61.8 |
| Northern America | 44.3 |
| Oceania | 36.9 |
| Latin America | 32.1 |
| Mexico | 22.9 |
| Other Central America | 29.6 |
| South America | 44.4 |
| Caribbean | 54.1 |

Source: U.S. Census Bureau, American Community Survey, 2010.

**Most foreign born who entered the United States before 1990 have obtained citizenship.**

- Of all foreign born who arrived before 1980, 80 percent were U.S. citizens in 2010. Sixty-three percent of the foreign born who arrived between 1980 and 1989 were natural-ized citizens.

- Among the foreign-born population who were born in Asia and arrived before 1980, more than 90 percent

were naturalized citizens. The foreign born from Asia also had the highest percent naturalized for those who arrived in the 1980-to-1989 and 1990-to-1999 periods.

- Among the foreign born from Latin America, the foreign born from the Caribbean and South America had the highest percent naturalized of those

who arrived before 1980 (each about 86 percent), as well as between 1980 and 1989 (70 percent and 74 percent, respectively).

- The foreign born from Mexico had the lowest percent natu-ralized for all period-of-entry groups.



Figure 9.
**Percent Naturalized by Period of Entry: 2010**
(Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see *www.census.gov/acs/www/*)

| | Before 1980 | 1980 to 1989 | 1990 to 1999 | 2000 or later |
|---|---|---|---|---|
| Foreign born | 79.8 | 63.1 | 42.9 | 13.7 |
| Africa | 87.5 | 77.5 | 64.3 | 21.5 |
| Asia | 91.8 | 85.5 | 67.9 | 18.8 |
| Europe | 83.4 | 67.1 | 63.2 | 22.3 |
| Northern America | 70.7 | 49.3 | 34.5 | 9.5 |
| Oceania | 65.1 | 58.1 | 43.9 | 11.4 |
| Latin America | 72.3 | 49.7 | 25.1 | 8.9 |
| Mexico | 61.8 | 36.0 | 14.5 | 5.1 |
| Other Central America | 76.7 | 52.0 | 23.2 | 7.8 |
| South America | 85.8 | 74.1 | 46.3 | 14.2 |
| Caribbean | 86.0 | 70.4 | 52.0 | 18.5 |

Source: U.S. Census Bureau, American Community Survey, 2010.

**Foreign-born households were more likely than native households to be family households.**

- More than three-fourths (77 percent) of foreign-born households and almost two-thirds (65 percent) of native households were family households.

- A higher proportion of foreign-born (55 percent) than native (48 percent) households were maintained by a married couple. Among the regions of birth, householders born in Asia (63 percent) and Oceania (62 percent) were the most likely to be in a married-couple household.[16] Within Latin America, households with a householder born in Mexico were the most likely to be maintained by a married couple (58 percent).

- Compared with other regions, householders born in Latin America were more likely to be female with no husband present. This is especially true for

Caribbean households, where 1 out of every 4 were families with a female householder with no husband present.

- Over one-third of households with a householder born in Northern America (40 percent) and Europe (37 percent) were nonfamily households, such as a person living alone or unrelated individuals living together.

[16] The estimates for Asia and Oceania are not statistically different.



Figure 10.
**Household Type: 2010**
(Percent distribution. Households are classified by nativity and region of birth of the householder. Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see www.census.gov/acs/www/)

| | Family households | | | Nonfamily households |
| --- | --- | --- | --- | --- |
| | Married couple | Male householder, no wife present | Female householder, no husband present | |
| Total | 48.6 | 4.7 | 13.1 | 33.6 |
| Native | 47.6 | 4.3 | 12.8 | 35.3 |
| Foreign born | 55.2 | 7.1 | 14.6 | 23.1 |
| Africa | 47.8 | 7.8 | 15.2 | 29.2 |
| Asia | 63.1 | 4.6 | 9.4 | 22.9 |
| Europe | 52.3 | 2.9 | 8.2 | 36.6 |
| Northern America | 51.9 | 2.2 | 6.4 | 39.5 |
| Oceania | 62.4 | 4.0 | 9.6 | 24.0 |
| Latin America | 52.4 | 9.9 | 19.8 | 17.8 |
| Mexico | 58.4 | 10.9 | 17.7 | 13.0 |
| Other Central America | 47.0 | 12.8 | 21.7 | 18.4 |
| South America | 51.4 | 7.3 | 17.5 | 23.8 |
| Caribbean | 41.2 | 7.3 | 25.5 | 26.0 |

Note: Some percentages do not sum to 100.0 due to rounding.
Source: U.S. Census Bureau, American Community Survey, 2010.

**When compared with native households, foreign-born households were larger, included more children under 18 years old, and were more likely to be multigenerational.**

- The average size of foreign-born households (3.4 persons) was larger than that of native households (2.5 persons). One reason for this difference is that a higher proportion of foreign-born family households (62 percent) than native-born family households (47 percent) included children under the age of 18.

- Additionally, a higher proportion of foreign-born family households (10 percent) than native-born family households (5 percent) were multigenerational households with three or more generations living together.[17]

- Households with a householder born in Northern America (38 percent) and Europe (39 percent) had the lowest proportion of family households with children under 18 years old.[18] Northern America was

also the region of birth with the lowest proportion of multigenerational households (2 percent).

- Within Latin America, households with a householder born in Mexico had the largest average household size at 4.4 persons. About 77 percent of family households had at least one child less than 18 years of age, and over 12 percent of family households were multigenerational.

[17] Multigenerational households are all family households, and contain three or more generations living together.
[18] The estimates for Northern America and Europe are not statistically different.



Figure 11.
**Total and Family Households: 2010**
(Households are classified by nativity and region of birth of the householder. Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see www.census.gov/acs/www/)

| | Average household size | Average family household size | Percent of family households with children under 18 | Percent of family households with three or more generations |
|---|---|---|---|---|
| Total | 2.6 | 3.3 | 49.3 | 5.7 |
| Native | 2.5 | 3.2 | 47.0 | 4.9 |
| Foreign born | 3.4 | 4.0 | 61.5 | 10.1 |
| Africa | 3.2 | 3.9 | 67.4 | 6.4 |
| Asia | 3.2 | 3.7 | 55.5 | 9.8 |
| Europe | 2.4 | 3.1 | 38.7 | 4.6 |
| Northern America | 2.3 | 2.9 | 37.5 | 2.3 |
| Oceania | 3.4 | 4.0 | 60.0 | 9.5 |
| Latin America | 3.9 | 4.4 | 70.3 | 12.0 |
| Mexico | 4.4 | 4.7 | 77.1 | 12.4 |
| Other Central America | 4.0 | 4.5 | 71.7 | 11.6 |
| South America | 3.2 | 3.7 | 58.7 | 9.1 |
| Caribbean | 3.1 | 3.8 | 56.7 | 13.0 |

Source: U.S. Census Bureau, American Community Survey, 2010.

**Half of all foreign born either spoke only English at home or spoke a language other than English at home and spoke English "very well."**

- About 85 percent of the foreign-born population spoke a language other than English at home, compared with about 10 percent of the native population.

- Fifteen percent of the foreign-born population spoke only English at home. An additional 33 percent spoke a language other than English at home and spoke English "very well."

- One in ten foreign born did not speak English at all.

- At least 70 percent of the foreign-born population from Northern America, Oceania, Africa, and Europe spoke either only English at home or a language other than English at home and spoke English "very well," compared with about 53 percent and 37 percent of the foreign-born population born in Asia and Latin America, respectively.

- Among the foreign-born population from Latin America, those born in the Caribbean were

more likely to speak only English at home (32 percent) than the foreign born from South America (15 percent), Other Central America (7 percent), and Mexico (3 percent).

- Over half of the foreign born from the Caribbean and South America spoke either only English at home or a language other than English at home and spoke English "very well."



Figure 12.
**Language Spoken at Home and English-Speaking Ability: 2010**

(Percent distribution of population 5 and older. Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see www.census.gov/acs/www/)

| | Spoke only English at home | Spoke a language other than English at home and spoke English | | | |
|---|---|---|---|---|---|
| | | Very well | Well | Not well | Not at all |
| Total | 79.4 | 11.9 | 4.0 | 3.2 | 1.5 |
| Native | 89.6 | 8.5 | 1.3 | 0.5 | 0.1 |
| Foreign born | 15.3 | 33.1 | 21.4 | 20.0 | 10.1 |
| Africa | 21.8 | 49.0 | 19.0 | 7.9 | 2.3 |
| Asia | 10.9 | 42.5 | 25.1 | 16.1 | 5.4 |
| Europe | 33.0 | 37.8 | 17.4 | 9.4 | 2.4 |
| Northern America | 78.7 | 17.0 | 2.8 | 1.2 | 0.3 |
| Oceania | 49.9 | 29.6 | 13.6 | 5.9 | 1.0 |
| Latin America | 10.4 | 26.6 | 21.3 | 26.3 | 15.5 |
| Mexico | 3.2 | 24.7 | 22.2 | 30.9 | 18.9 |
| Other Central America | 6.7 | 25.6 | 22.4 | 28.7 | 16.6 |
| South America | 15.4 | 38.1 | 23.2 | 17.4 | 5.9 |
| Caribbean | 31.9 | 24.7 | 15.9 | 16.5 | 10.9 |

Note: Some percentages do not sum to 100.0 due to rounding.
Source: U.S. Census Bureau, American Community Survey, 2010.

**About two-thirds of the foreign born were high school graduates or higher.**

- Among the foreign born aged 25 and older, 68 percent were high school graduates or higher, including 27 percent who had a bachelor's degree or higher. By comparison, 89 percent of the native born aged 25 and older were high school graduates, including 28 percent who had a bachelor's degree or higher.

- Over 80 percent of the foreign-born population born in Africa, Asia, Europe, Northern America, and Oceania were high school graduates or higher, compared with about 53 percent of those born in Latin America.

- Just under half (49 percent) of the foreign born from Asia completed a bachelor's degree or higher.

- About 40 percent of the foreign-born population born in Mexico and half (50 percent) born in Other Central America were high school graduates or higher, compared with 83 percent born in South America and 73 percent born in the Caribbean.



Figure 13.
**Educational Attainment: 2010**

(Percent distribution of population 25 and older. Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see *www.census.gov/acs/www/*)

| | Less than high school graduate | High school graduate or equivalency | Some college or associate's degree | Bachelor's degree or higher |
|---|---|---|---|---|
| Total | 14.4 | 28.5 | 28.9 | 28.2 |
| Native | 11.0 | 29.7 | 30.9 | 28.4 |
| Foreign born | 31.7 | 22.5 | 18.8 | 27.0 |
| Africa | 12.1 | 20.0 | 27.7 | 40.3 |
| Asia | 16.2 | 16.6 | 18.7 | 48.5 |
| Europe | 15.2 | 25.2 | 23.3 | 36.4 |
| Northern America | 10.0 | 20.1 | 27.5 | 42.5 |
| Oceania | 14.0 | 23.2 | 30.0 | 32.9 |
| Latin America | 46.8 | 25.3 | 16.7 | 11.2 |
| Mexico | 60.1 | 23.0 | 11.6 | 5.3 |
| Other Central America | 49.7 | 24.8 | 16.5 | 9.0 |
| South America | 17.3 | 28.5 | 26.4 | 27.8 |
| Caribbean | 26.7 | 30.1 | 24.8 | 18.5 |

Note: Some percentages do not sum to 100.0 due to rounding.
Source: U.S. Census Bureau, American Community Survey, 2010.

**The labor force participation rate of the foreign-born population was higher than that of the native born.**

- Of the foreign-born population aged 16 and older, 68 percent participated in the labor force. By comparison, 64 percent of the native population aged 16 and older participated in the labor force.

- Foreign-born males (79 percent) were more likely to be in the labor force than native males (68 percent). In contrast, native females (60 percent) were more likely to have participated in the labor force compared with

foreign-born females (57 percent).

- About 70 percent or more of the foreign born from Africa, Latin America, and Oceania were in the labor force. Over 80 percent of foreign-born males from these three regions participated in the labor force.

- Among the foreign born from Latin America, those born in Other Central America had the highest total (77 percent),

male (88 percent), and female (65 percent) labor force participation rate.[19]

- Forty-eight percent of the native labor force was female, compared with 43 percent of the foreign-born labor force. About half of the foreign-born labor force from the Caribbean was female.

[19] The estimate for Other Central America females is not statistically different from the estimate for South America females.



Figure 14.
**Labor Force Participation: 2010**
(Percent of population 16 and older. Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see www.census.gov/acs/www/)

| | Both sexes | Male | Female | Percent female in total labor force |
|---|---|---|---|---|
| Total | 64.4 | 69.8 | 59.3 | 47.3 |
| Native | 63.8 | 68.1 | 59.7 | 48.1 |
| Foreign born | 67.7 | 78.9 | 57.0 | 42.9 |
| Africa | 75.1 | 82.4 | 67.0 | 42.3 |
| Asia | 66.2 | 75.6 | 58.0 | 46.8 |
| Europe | 57.5 | 67.5 | 49.4 | 47.6 |
| Northern America | 57.4 | 67.5 | 49.2 | 47.2 |
| Oceania | 71.3 | 82.5 | 60.9 | 44.1 |
| Latin America | 70.7 | 82.9 | 58.0 | 40.0 |
| Mexico | 70.0 | 84.6 | 52.8 | 34.9 |
| Other Central America | 77.2 | 88.0 | 65.1 | 39.7 |
| South America | 72.6 | 82.2 | 64.6 | 48.3 |
| Caribbean | 66.5 | 72.0 | 61.7 | 50.5 |

Source: U.S. Census Bureau, American Community Survey, 2010.

**The foreign born were more likely than the native born to work in service, construction, and production jobs.**

- Over half of the civilian employed foreign-born population aged 16 and older worked in either management, business, science, and arts occupations (29 percent) or service occupations (25 percent).

- Over one-third of the civilian employed native population aged 16 and older worked in management, business, science, and arts occupations (37 percent), with about one-fourth working in sales and office occupations (26 percent).

- Management, business, science, and arts occupations accounted for the largest share of the civilian employed foreign born aged 16 and older from Northern America (59 percent), Asia (47 percent), Europe (45 percent), Oceania (41 percent), and Africa (38 percent).

- The foreign born from Latin America were the least likely of all region-of-birth groups to work in management, business, science, and arts occupations (14 percent), but the most likely to work in service occupations (31 percent).

- Within Latin America, the foreign born from Mexico were the least likely to work in management, business, science, and arts occupations (9 percent).



Figure 15.
**Occupation: 2010**
(Percent distribution of civilian employed population 16 and older. Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see *www.census.gov/acs/www/*)

| | Management, business, science, and arts | Service | Sales and office | Natural resources, construction, and maintenance | Production, transportation, and material moving |
|---|---|---|---|---|---|
| Total | 35.9 | 18.0 | 25.0 | 9.1 | 11.9 |
| Native | 37.4 | 16.6 | 26.4 | 8.4 | 11.2 |
| Foreign born | 28.6 | 25.1 | 17.8 | 13.0 | 15.5 |
| Africa | 37.7 | 24.8 | 19.8 | 3.3 | 14.4 |
| Asia | 47.4 | 17.5 | 21.0 | 3.4 | 10.6 |
| Europe | 44.6 | 16.7 | 19.4 | 8.5 | 10.7 |
| Northern America | 59.0 | 9.3 | 21.1 | 4.6 | 6.0 |
| Oceania | 40.9 | 19.5 | 22.6 | 6.8 | 10.3 |
| Latin America | 14.1 | 31.2 | 15.6 | 19.8 | 19.3 |
| Mexico | 8.6 | 31.3 | 12.6 | 25.2 | 22.3 |
| Other Central America | 10.9 | 34.6 | 14.5 | 20.5 | 19.5 |
| South America | 27.5 | 27.5 | 21.7 | 10.6 | 12.7 |
| Caribbean | 24.8 | 30.4 | 21.7 | 8.4 | 14.7 |

Note: Some percentages do not sum to 100.0 due to rounding.
Source: U.S. Census Bureau, American Community Survey, 2010.

**The median income of foreign-born households was less than that of native households, regardless of household type.**

- The median household income of foreign-born households in the 12 months prior to being surveyed was $46,224, compared with $50,541 for native households. The difference in income was larger when focusing only on family households: the median income was $62,358 for families with a native householder and $49,785 for families with a foreign-born householder.

- The median income for households with a foreign-born householder born in Oceania was $71,441, which exceeded the median income of the native

household population and that of households with householders born in all other region-of-birth groups. However, among family households, the median income of families with a foreign-born householder from Northern America was the highest at $83,369.

- The median income for households with a foreign-born householder born in Latin America was $38,238. Considering the areas within Latin America, foreign-born households with a householder born in Mexico had the lowest median household

income ($35,254), while those with householders born in South America had the highest median household income ($49,741).[20]

- Family households with a foreign-born householder from Europe had a median income ($68,062) that was two-and-a-half times larger than corresponding nonfamily households ($27,472), the highest such ratio among the region-of-birth groups.

[20] The estimates of median household income of all native households ($50,541) and all households with a householder born in South America ($49,741) are not statistically different.



Figure 16.
**Median Household Income by Household Type: 2010**

(Household income in the past 12 months in 2010 inflation-adjusted dollars. Households are classified by nativity and region of birth of the householder. Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see www.census.gov/acs/www/)

| | All households | Family households | Nonfamily households | Family/nonfamily median income ratio |
|---|---|---|---|---|
| Total | $50,046 | $60,609 | $30,440 | 1.99 |
| Native | $50,541 | $62,358 | $30,585 | 2.04 |
| Foreign born | $46,224 | $49,785 | $28,287 | 1.76 |
| Africa | $45,926 | $51,587 | $31,070 | 1.66 |
| Asia | $63,777 | $72,114 | $33,827 | 2.13 |
| Europe | $51,764 | $68,062 | $27,472 | 2.48 |
| Northern America | $64,095 | $83,369 | $36,668 | 2.27 |
| Oceania | $71,441 | $76,152 | $45,385 | 1.68 |
| Latin America | $38,238 | $38,554 | $25,133 | 1.53 |
| Mexico | $35,254 | $34,523 | $23,767 | 1.45 |
| Other Central America | $41,305 | $39,837 | $28,791 | 1.38 |
| South America | $49,741 | $52,860 | $30,707 | 1.72 |
| Caribbean | $39,934 | $44,921 | $21,817 | 2.06 |

Source: U.S. Census Bureau, American Community Survey, 2010.

**The foreign born were less likely than the native born to have health insurance coverage and to be covered by a private insurer.**

- About 9 out of 10 native born (87 percent) had some form of health insurance coverage, compared with just under 2 out of 3 foreign born (66 percent). Among those who had health insurance, 78 percent of natives and 75 percent of the foreign born were covered by a private health insurance provider.

- Among the foreign born, those born in Latin America were least likely to be covered by some form of health insurance (51 percent). The foreign born from all other regions had health insurance coverage rates of about 74 percent or more. Those born in Latin America who did have health insurance also were least likely to be covered by a private insurer (68 percent).

- Among the foreign born from Latin America, those born in the Caribbean were most likely to have some form of health insurance coverage (71 percent). However, the foreign born from the Caribbean who did have health insurance were less likely to be covered by a private insurer (63 percent) than those born in any other area within Latin America.



Figure 17.
**Percent of Population With Health Insurance Coverage: 2010**
(Based on the civilian noninstitutionalized population. Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see *www.census.gov/acs/www/*)

| | Percent with health insurance | Percent insured covered by private health insurance |
|---|---|---|
| Total | 84.5 | 77.9 |
| Native | 87.3 | 78.2 |
| Foreign born | 65.7 | 75.3 |
| Africa | 74.3 | 76.1 |
| Asia | 81.2 | 79.7 |
| Europe | 87.0 | 81.1 |
| Northern America | 91.8 | 89.8 |
| Oceania | 83.1 | 87.6 |
| Latin America | 50.7 | 67.8 |
| Mexico | 42.2 | 65.3 |
| Other Central America | 45.2 | 72.5 |
| South America | 65.2 | 77.9 |
| Caribbean | 71.2 | 63.4 |

Source: U.S. Census Bureau, American Community Survey, 2010.

**The poverty rate was higher for the foreign born than for the native born.**

- About 19 percent of the foreign born were living below the poverty level in the 12 months prior to being surveyed, compared with about 15 percent of the native born.[21]

- Among the regions of birth, the poverty rate was highest for the foreign-born population from Latin America (24 percent) and Africa (21 percent). Within Latin America, the poverty rate was highest for the foreign-born population born in Mexico (28 percent).

- About 31 percent of foreign-born children (under the age of 18) were living below the poverty level, compared with about 21 percent of native born. About 39 percent of foreign-born children born in Latin America and 37 percent born in Africa were living in poverty.[22] Of foreign-born children born in Mexico, more than 2 in every 5 (46 percent) were living below the poverty

level. About 30 percent of foreign-born children from the Caribbean or Other Central America lived in poverty.[23]

- About 16 percent of foreign-born adults aged 65 and older were living below the poverty level, compared with about 8 percent of native born. Of foreign-born adults aged 65 and older born in Latin America, about 21 percent were living below the poverty level. More than 1 in 5 foreign-born adults aged 65 and older born in Mexico or the Caribbean lived in poverty.

---

[21] Following the Office of Management and Budget's (OMB) Statistical Policy Directive 14, poverty status is determined by comparing annual income to a set of dollar values called thresholds that vary by family size, number of children, and age of householder. If a family's before tax money income is less than the dollar value of its threshold, then that family and every individual in it are considered to be in poverty. For example, the poverty threshold for a family of three with one child under the age of 18 was $17,268 in 2009. Because the ACS is a continuous survey and income is reported for the previous 12 months, the appropriate poverty threshold for each family is determined by multiplying the base-year threshold by the average of monthly CPI values for the 12 months preceding the survey month. Poverty status is determined for all people except institutionalized people, people in military group quarters, people in college dormitories, and unrelated individuals under 15 years old. For more information, see "How Poverty Is Calculated in the ACS" at *www.census.gov/hhes/www/poverty /methods/definitions.html*.

[22] The estimates for Latin America and Africa are not statistically different.

[23] The estimate of the percent of foreign-born children from the Caribbean who lived in poverty (31.6 percent) is not statistically higher than the percent of foreign-born children from Other Central America who lived in poverty (28.9 percent).



Figure 18.
**Poverty Rate: 2010**
(Percent of specific group in poverty in the past 12 months. Data based on sample. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see *www.census.gov/acs/www/*)

|  | All ages | Under 18 | 18 to 64 | 65 and older |
|---|---|---|---|---|
| Total | 15.3 | 21.6 | 14.2 | 9.0 |
| Native | 14.8 | 21.2 | 13.4 | 8.1 |
| Foreign born | 18.8 | 30.9 | 18.2 | 15.8 |
| Africa | 20.7 | 37.3 | 18.9 | 16.4 |
| Asia | 14.0 | 22.4 | 13.0 | 15.2 |
| Europe | 10.0 | 13.7 | 9.2 | 11.1 |
| Northern America | 9.1 | 10.0 | 8.8 | 9.9 |
| Oceania | 14.5 | 28.4 | 14.1 | 7.3 |
| Latin America | 23.6 | 38.6 | 22.6 | 20.6 |
| Mexico | 28.1 | 46.3 | 26.8 | 22.7 |
| Other Central America | 21.1 | 28.9 | 20.8 | 18.1 |
| South America | 13.3 | 18.8 | 12.6 | 14.7 |
| Caribbean | 19.1 | 31.6 | 17.6 | 21.4 |

Source: U.S. Census Bureau, American Community Survey, 2010.

## SOURCE OF THE DATA AND ACCURACY OF THE ESTIMATES

Data presented in this report are based on people and households that responded to the ACS in 2010. The resulting estimates are representative of the entire population. All comparisons presented in this report have taken sampling error into account and are significant at the 90 percent confidence level unless otherwise noted. Due to rounding, some details may not sum to totals. For information on sampling and estimation methods, confidentiality protection, and sampling and nonsampling errors, please see the "2010 ACS Accuracy of the Data" document located at *www.census.gov/acs/www /Downloads/data_documentation /Accuracy/2010ACS_Accuracy_of _Data.pdf*.

## WHAT IS THE AMERICAN COMMUNITY SURVEY?

The American Community Survey (ACS) is a nationwide survey designed to provide communities with reliable and timely demographic, social, economic, and housing data for the nation, states, congressional districts, counties, places, and other localities every year. It has an annual sample size of about 3 million addresses across the United States and Puerto Rico and includes both housing units and group quarters (e.g., nursing facilities and prisons). The ACS is conducted in every county throughout the nation, and every municipio in Puerto Rico, where it is called the Puerto Rico Community Survey. Beginning in 2006, ACS data for 2005 were released for geographic areas with populations of 65,000 and greater. For information on the ACS sample design and other topics, visit *www.census.gov/acs /www*.

## FOR MORE INFORMATION

Additional information about the foreign-born population is available on the Census Bureau's Web site at *www.census.gov/population /foreign/*.

## CONTACT

For additional information on these topics, please call 1-866-758-1060 (toll free) or visit *www.census.gov*.

## USER COMMENTS

The Census Bureau welcomes the comments and advice of users of our data and reports. Please send comments and suggestions to:

Chief, Population Division
U.S. Census Bureau
Washington, DC  20233-8800

# EXHIBIT J

DEPARTMENT OF HOMELAND SECURITY (DHS)
## IMMIGRATION DETAINER -- REQUEST FOR VOLUNTARY ACTION

| | | |
|---|---|---|
| Subject ID: 355224264<br>Event #: PHO1603000820 | T257400 | File No:<br>Date: March 19, 2016 |

TO: (Name and Title of Institution - OR Any Subsequent Law Enforcement Agency) MARICOPA COUNTY JAIL
201 SOUTH 4TH AVE.
PHOENIX, AZ 85003

FROM: (DHS Office Address)
PHOENIX, AZ, DOCKET CONTROL OFFICE
ERO Phoenix Field Office
2035 N CENTRAL AVE
PHOENIX, AZ 85004

Name of Subject: GONZALEZ-GOODMAN, JACINTA

Date of Birth: ⬛⬛⬛⬛   Citizenship: MEXICO   Sex: F

### 1. DHS HAS DETERMINED THAT (mark at least one option in subsection A and one option in subsection B, or skip to section 2):

**A. THE SUBJECT IS AN IMMIGRATION ENFORCEMENT PRIORITY BECAUSE HE/SHE:**

☐ has engaged in or is suspected of terrorism or espionage, or otherwise poses a danger to national security;

☐ has been convicted of an offense of which an element was active participation in a criminal street gang, as defined in 18 U.S.C. § 521(a), or is at least 16 years old and intentionally participated in an organized criminal gang to further its illegal activities;

☐ has been convicted of an offense classified as a felony, other than a state or local offense for which an essential element was the alien's immigration status;

☐ has been convicted of an aggravated felony, as defined under 8 U.S.C. § 1101(a)(43) at the time of conviction;

☐ has been convicted of a "significant misdemeanor," as defined under DHS policy; and/or

☐ has been convicted of 3 or more misdemeanors, not including minor traffic offenses and state or local offenses for which immigration status was an essential element, provided the offenses arise out of 3 separate incidents.

**B. PROBABLE CAUSE EXISTS THAT THE SUBJECT IS A REMOVABLE ALIEN. THIS DETERMINATION IS BASED ON:**

☐ a final order of removal against the subject;

☒ the pendency of ongoing removal proceedings against the subject;

☐ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☒ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

### 2. DHS TRANSFERRED THE SUBJECT TO YOUR CUSTODY FOR A PROCEEDING OR INVESTIGATION.

☐ Upon completion of the proceeding or investigation for which the subject was transferred to your custody, DHS intends to resume custody of the subject to complete processing.

**IT IS THEREFORE REQUESTED THAT YOU:**

- Serve a copy of this form on the subject and maintain custody of him/her for a period NOT TO EXCEED 48 HOURS beyond the time when he/she would otherwise have been released from your custody to allow DHS to assume custody. This request takes effect only if you serve a copy of this form on the subject, and it does not request or authorize that you hold the subject beyond 48 hours. This request arises from DHS authorities and should not impact decisions about the subject's bail, rehabilitation, parole, release, diversion, custody classification, work, quarter assignments, or other matters.

- As early as possible prior to the time you otherwise would release the subject, please notify DHS by calling ☒U.S. Immigration and Customs Enforcement (ICE) or ☐ U.S. Customs and Border Protection (CBP) at 602-379-3235
If you cannot reach an official at the number(s) provided, please contact the Law Enforcement Support Center at: (802) 872-6020.

- Notify this office in the event of the subject's death, hospitalization or transfer to another institution.

☐ If checked: Please cancel the detainer related to this subject previously submitted to you on _____ (date).

G 8230 LINDROS - Deportation Officer

_____          _____
(Name and title of Immigration Officer)          (Signature of Immigration Officer)

Notice: If the subject is taken into DHS custody, he or she may be removed from the United States. If the subject may be the victim of a crime or you want the subject to remain in the United States for a law enforcement purpose, please notify the ICE Law Enforcement Support Center at (802) 872-6020. You may also call this number if you have any other questions or concerns about this matter.

**TO BE COMPLETED BY THE LAW ENFORCEMENT AGENCY CURRENTLY HOLDING THE SUBJECT OF THIS NOTICE:**

Please provide the information below, sign, and return to DHS by mailing, emailing, or faxing a copy to _____

Local Booking/Inmate #: _____ Est. release date/time: _____ Date of latest criminal charge/conviction: _____

Latest offense charged/convicted: _____

This Form I-247D was served upon the subject on _____, in the following manner:
☐ in person    ☐ by inmate mail delivery    ☐ other (please specify): _____

_____          _____
(Name and title of Officer)          (Signature of Officer)

DHS Form I-247D (5/15)

# EXHIBIT K

# OFFICE OF ENFORCEMENT AND REMOVAL OPERATIONS
# PRIORITY ENFORCEMENT PROGRAM (PEP)



U.S. Immigration and Customs Enforcement

## ABOUT PEP

The Department of Homeland Security's (DHS) Priority Enforcement Program (PEP) enables DHS to work with state and local law enforcement to take custody of individuals who pose a danger to public safety before those individuals are released into our communities. PEP was established at the direction of DHS Secretary Jeh Johnson in a November 20, 2014 memorandum, entitled Secure Communities, that discontinued the Secure Communities program. PEP focuses on convicted criminals and others who pose a danger to public safety.

## HOW IT WORKS

PEP begins at the state and local level when an individual is arrested and booked by a law enforcement officer for a criminal violation and his or her fingerprints are submitted to the FBI for criminal history and warrant checks. This same biometric data is also sent to U.S. Immigration and Customs Enforcement (ICE) so that ICE can determine whether the individual is a priority for removal, consistent with the DHS enforcement priorities described in Secretary Johnson's November 20, 2014 Secure Communities memorandum. Under PEP, ICE will seek the transfer of a removable individual when that individual has been convicted of an offense listed under the DHS civil immigration enforcement priorities, has intentionally participated in an organized criminal gang to further the illegal activity of the gang, or poses a danger to national security.

## WHAT ARE DHS' PRIORITIES FOR REMOVAL?

PEP builds upon the enforcement priorities set forth in the November 20, 2014 Memorandum from DHS Secretary Jeh Johnson entitled Policies for the Apprehension, Detention and Removal of Undocumented Immigrants.

The memorandum can be found at:
http://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf.

## HOW IS PEP DIFFERENT FROM SECURE COMMUNITIES?

PEP focuses on targeting individuals convicted of significant criminal offenses or who otherwise pose a threat to public safety. Under prior policy, detainers could be issued when an immigration officer had reason to believe the individual was removable and fell within one or more enumerated priorities, which included immigration-related categories and having been convicted of or charged with certain crimes.

Under PEP, ICE will only seek transfer of individuals in state and local custody in specific, limited circumstances. ICE will only issue a detainer where an individual fits within DHS's narrower enforcement priorities and ICE has probable cause that the individual is removable. In many cases, rather than issue a detainer, ICE will instead request notification (at least 48 hours, if possible) of when an individual is to be released. ICE will use this time to determine whether there is probable cause to conclude that the individual is removable.

Under PEP, DHS will no longer use the Form I-247 (Immigration Detainer – Notice of Action) and will instead use two new forms:

Form I-247N, Request for Voluntary Notification of Release of Suspected Priority Alien.
The Form I-247N requests the receiving local law enforcement agency (LEA) notify ICE of the pending release from custody of a suspected priority removable individual at least 48 hours prior to release, if possible. The Form I-247N does not request or authorize the LEA to hold an individual beyond the point at which he or she would otherwise be released. Additionally, on the Form I-247N, ICE must identify the enforcement priority under which the individual falls.

Form I-247D, Immigration Detainer - Request for Voluntary Action.
The Form I-247D requests the receiving LEA maintain custody of the priority individual for a period not to exceed 48 hours beyond the time when he or she would have otherwise been released from custody. On this form, ICE must identify the enforcement priority under which the individual falls, as well as the basis for its determination of probable cause. The LEA must also serve a copy of the request on the individual in order for it to take effect.

## PUBLIC INFORMATION

ICE's Enforcement and Removal Operations (ERO) is committed to a transparent process and to resolving concerns as promptly as possible. For this reason, concerns or questions regarding ICE practices, policies and/or programs should first be directed to the local field liaison. Stakeholders can reach out to their local ERO field office using the following website address: http://www.ice.gov/contact/ero.

OFFICE OF ENFORCEMENT AND REMOVAL OPERATIONS
# PRIORITY ENFORCEMENT PROGRAM (PEP)

 **U.S. Immigration and Customs Enforcement**

## COMPARISON OF SECURE COMMUNITIES AND THE PRIORITY ENFORCEMENT PROGRAM

| SECURE COMMUNITIES | PRIORITY ENFORCEMENT PROGRAM |
|---|---|
| Relied on fingerprint based biometric data submitted during bookings by state and local law enforcement agencies to the FBI for criminal background checks. | Continues to rely on fingerprint-based biometric data submitted during bookings by state and local law enforcement agencies to the FBI for criminal background checks. |
| Prior to December 21, 2012, the only policy limitations on detainer issuance were that: (1) a law enforcement agency (LEA) had exercised its independent authority to arrest the individual; and (2) the immigration officer had reason to believe that the individual was subject to ICE detention for removal or removal proceedings.<br><br>Circumstances under which a detainer could be issued were narrowed by a December 12, 2012 policy memorandum, but still included individuals charged, but not yet convicted, of criminal offenses, in addition to individuals with no criminal history, such as individuals with final orders of removal from an immigration judge. Detainers could also be issued in circumstances in which ICE determined an individual posed a significant risk to national security, border security, or public safety. | A November 20, 2014 memorandum from DHS Secretary Jeh Johnson significantly narrows the category of individuals for whom DHS will seek transfer from LEA custody and prioritizes individuals who pose a threat to public safety. Under PEP, ICE will no longer seek transfer of individuals with civil immigration offenses alone, or those charged, but not convicted of criminal offenses.<br><br>Instead, ICE will seek transfer where a removable individual has been convicted of specifically enumerated crimes, has intentionally participated in criminal gang activity, or poses a danger to national security. |
| Requested that LEAs detain an individual beyond his or her scheduled release date. | In many cases, ICE will simply request notification of when an individual who falls within the PEP priorities is to be released—rather than issue a request for detention beyond that point.<br><br>Under PEP, detainers may only be issued in limited circumstances, when ICE indicates on the form that the individual is both a PEP enforcement priority and that there is probable cause to believe that the subject is removable (such as a final order of removal). |
| Detainer form <u>requested</u> that LEA provide a copy to the individual subject to the detainer. | Detainer form <u>requires</u> that LEA provide a copy to the individual subject to the detainer <u>in order for the request to be effective</u>. |
| Request to maintain custody was limited to 48 hours, excluding Saturdays, Sundays, and holidays. | Request to maintain custody is limited to 48 hours. Saturdays, Sundays, and holidays are no longer excluded. |
| Basis for "reason to believe" the subject was removable, and therefore subject to a request for detention, was not disclosed on the detainer form. | Detainer form requires that the basis for "probable cause" that an individual is removable be indicated:<br><br>· final order of removal;<br>· pendency of removal proceedings;<br>· biometric match reflecting no lawful status or otherwise removable; or<br>· statements by the subject to an immigration officer and/or other reliable evidence. |
| Some ICE detainers were issued with respect to foreign-born individuals who did not have records or a biometric match in ICE databases without any other additional information. | ICE no longer issues detainers in cases of foreign-born individuals who do not have records or a biometric match in ICE databases, without any other additional information. Detainers must include an indication of probable cause and that the individual is an enforcement priority under PEP. |

500 12th Street, SW • Washington, DC • 20536 • www.ice.gov

# EXHIBIT L



# IN THE SUPERIOR COURT OF ARIZONA
## McDowell Mountain Justice Court - Maricopa County
### Final Release Order and Order Regarding Counsel

State of Arizona          1 Cnt OBST HWY/PUB LI M3

vs.

Jacinta Gonzalez

CaseNumber: PF2016112955003

Booking#: T257400

It is hereby ordered that Jacinta Gonzalez shall be released as indicated and must comply with ALL release conditions.

## NEXT HEARINGS

Arraignment Hearing          April 06, 2016 at 08:30 AM at Northeast Regional Court Center, 18380 N. 40th Street, Phoenix, AZ, 85032   Docket: JCJ11

WARNING: If the defendant appears at the next hearing without a lawyer, the hearing may still proceed as scheduled.

## RELEASE TYPE

**Bailable As a Matter of Right**

The defendant has been found to be bailable as a matter of right. IT IS HEREBY ORDERED that the defendant must comply with all release conditions and shall be released from custody in this Cause Number as follows:

**Release Own Recognizance**

The defendant is released without any condition of an undertaking relating to, or deposit of security, and promises to appear in Court as required.

## RELEASE CONDITIONS

1. You are not to initiate contact with the arresting officers.
2. You are not to possess any drugs without a valid prescription.
3. You are not to drive a motor vehicle without a valid driver's license.
4. You must continue to provide the court with proof of your local address.

You must appear at all court proceedings in this case or your release conditions can be revoked, a warrant will be issued and proceedings may go forward in your absence. In addition, failure to appear at a future court proceeding may result in a waiver of any claim that you were not informed of a plea offer made in your case by the State. a.You will appear to answer and submit to all further orders and processes of the court having jurisdiction of the case. b.You will refrain from committing any criminal offenses.c.You will diligently prosecute any appeal. d.You will not leave the state without permission of the court.

If you violate any conditions of this release order, the court may order the bond and any security deposited in connection therewith forfeited to the State of Arizona. In addition, the court may issue a warrant for your arrest upon learning of your violation of any conditions of your release. After a hearing, if the court finds that you have not complied with the conditions of release, it may modify the conditions or revoke your release altogether.

## ATTORNEY APPOINTMENT

The defendant is NOT entitled to court appointed counsel due to nature of the charge. Rule 6.1(a) Arizona Rules of Criminal Procedure.

## ACKNOWLEDGEMENT BY DEFENDANT

I have received a copy of this form. I understand the standard conditions, all other conditions, and the consequences of violating this release order. I agree to comply fully with each of the conditions imposed on my release and to notify the court promptly in the event I change my place of residence.

Date 3/19/2016 8:00:00 PM

Address: �altered▋

City, State, Zip: NEW ORLEANS, LA, ▋

Signature: _____

**Eartha Washington**
Judge / Commissioner

**Jacinta Gonzalez**
Defendant